June 22, 2018

**Supreme Court**

No. 2017-92-C.A.
(P1/14-1880A)

| | |
|---|---|
| State | : |
| v. | : |
| Curtis Maxie. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Supreme Court

No. 2017-92-C.A.
(P1/14-1880A)
(concurrence and dissent
 begin on page 23)

|  |  |
|---|---|
| State | : |
| v. | : |
| Curtis Maxie. | : |

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Justice Flaherty, for the Court.**  The defendant, Curtis Maxie, appeals from a judgment of conviction after a jury found him guilty of three counts of first-degree sexual assault, one count of sex trafficking of a minor, and one count of conspiracy to commit sex trafficking of a minor.  On appeal, the defendant challenges his convictions on count 4, sex trafficking of a minor in violation of G.L. 1956 § 11-67-6, and count 6, conspiring to do so.  He argues that § 11-67-6, which has since been repealed, was fatally defective because it failed to state a crime.  The defendant further contends that count 4 was duplicitous, depriving him of fair notice of the charge against him.  Finally, the defendant maintains that certain evidence of uncharged misconduct should have been excluded from his trial.  For the reasons set forth in this opinion, we vacate the judgment of conviction with respect to counts 4 and 6 and affirm the judgment in all other respects.

- 1 -

# I

## Facts and Travel

Emily, the victim in this story, endured a tumultuous childhood marked by abusive, if not absent, biological parents.[1]  She was adopted by her aunt and uncle, but that did not put an end to her troubles.  In that home as well, Emily was also abused and neglected.  It should come as no surprise, then, that Emily was prone to running away from home.  That tendency, coupled with her penchant for fighting, led to her placement in a behavioral school and contacts with the Family Court.  In April 2014, at the age of sixteen, Emily ran away from home once again.  This time, however, the story took an even darker turn.

With nowhere to go, Emily ended up at the home of her friend's mother in Providence. Emily and that woman had smoked marijuana together previously, and Emily enjoyed her company.  When Emily arrived, her friend was not at home, but his twenty-year-old brother, Marquis Melia, was present.  After Emily spent the night there, Melia convinced her to go with him to Pawtucket to smoke with his friend.  As it turned out, that friend was defendant.

Melia referred to the nearly sixty-year-old defendant as "Pimp."  Late at night on April 16, 2014—the night Emily arrived at Melia's mother's house—Melia sent the following text message to defendant: "Hey pimp I got a fresh catch all american white g[i]rl 18."  Sitting on the couch, Emily could actually see Melia typing the message and could make out the words "fresh catch" in the text, but she was in the dark as to what that meant.  Sadly, she would soon find out.

As Melia would later testify, defendant's interest was immediately piqued by the prospect of a "fresh catch."  Melia knew "[100] percent" that that would be the case.  He also knew that,

---

[1] We use a pseudonym to protect the privacy of the minor victim.

with defendant's help and expertise, they would be able to "put [Emily] to work" "[h]aving sex with men for money." Just moments after receiving Melia's text message, defendant began pressuring Melia to bring Emily to his home that very night, despite the late hour. When Melia resisted, saying that it was too late to take a bus but that they would be there the next day, defendant offered to pay for a cab. But when Melia would not heed that suggestion because Emily wanted to sleep, defendant offered his outlook: "F**k what she want. Get the b***h in the cab before you won't have a b***h [in] the morning to do any fool." Melia reassured defendant that he would get Emily there the next day and "have her ready to go." By that, Melia meant that they would "take pics and post" them to Backpage.[2]

The defendant was eager. Early the next morning, April 17, defendant sent a text message to Melia that he was ready to take pictures of Emily. As Melia knew, defendant had "some nylons and high heels for all of them, for all the women he had over there and he would snap pictures in his bedroom while they were on his bed posing." Melia responded that he and Emily would be over by noon and that "she ready." In fact, she was not ready for what was in

---

[2] As a result of heinous crimes arising out of transactions on that website, this Court has twice had occasion to discuss Backpage: it was "a classified advertising website where individuals [could] list a variety of products and services. Until January 2017, Backpage included an adult section containing different subcategories of various sex work professions, including escorts and strippers." *State v. Tejeda*, 171 A.3d 983, 987 n.1 (R.I. 2017) (quoting *State v. Adams*, 161 A.3d 1182, 1187 n.1 (R.I. 2017)). Recently, federal authorities seized the website, which had been long accused of enabling prostitution and sex trafficking of minors, took it offline, and indicted the company's top executives on a variety of charges. The chief executive of Backpage pleaded guilty in California and Texas state courts and in federal court in Arizona to money laundering and conspiracy to facilitate prostitution, and he pled guilty to human trafficking on behalf of the company. As part of his plea agreement, he agreed to testify against other company officials and to take down every Backpage website. *See* Charlie Savage & Timothy Williams, *U.S. Seizes Website Accused in Sex Trafficking*, N.Y. Times, Apr. 8, 2018, at A14; Tom Jackman, *Backpage CEO Carl Ferrer pleads guilty in three states, agrees to testify against other website officials*, Wash. Post (Apr. 13, 2018), https://www.washingtonpost.com/news/true-crime/wp/2018/04/13/backpage-ceo-carl-ferrer-pleads-guilty-in-three-states-agrees-to-testify-against-other-website-officials.

store; in Emily's mind, she was going to the home of Melia's friend to smoke marijuana and to play video games.

Melia and Emily traveled by bus from Providence to Pawtucket. When they arrived at defendant's house, Emily thought defendant was nice and respectful, but that would soon change. The defendant sent Melia on an errand to buy a "Vanilla card," which is, in essence, a prepaid credit card—it is purchased with cash, and then it can be used without being traced. There was a charge to post an advertisement on Backpage, so when the ad concerned illicit activity, anonymity was crucial, and defendant was no novice. Unfortunately, however, Melia was. It took two trips to the store before Melia purchased the correct card.

Meanwhile, Emily was left alone with defendant. The two were on the couch when defendant pulled Emily by her arm toward him and removed her clothing. The defendant lay down on top of Emily and removed her underwear. All the while, she was telling him to stop. He did not. Instead, defendant proceeded to remove his own clothing. He told Emily that he needed to see if she was "[g]irlfriend experience." The defendant then penetrated Emily vaginally, ignoring her pleas to stop and overpowering her pushes on his chest.[3] But that was not enough for defendant. The defendant said he needed to "try [Emily] out" in all ways. So he grabbed her head and penetrated her orally as well.[4]

Soon, Melia returned from his first foray at the store. After Emily answered the door, she pulled Melia into the hallway, slapped him in the face, and told him, "I feel violated." He responded: "We have to finish what we came here for."

When Melia returned from his second trip to the store, he noticed that Emily looked sad and was wearing high heels. The defendant was sitting at his computer, and Melia could see that

---

[3] This act formed the basis for the first count of first-degree sexual assault.
[4] This act formed the basis for the second count of first-degree sexual assault.

he had already taken pictures of Emily posing in high heels, a bra, and underwear. The defendant had his phone plugged in to his laptop, uploading the pictures and "cropping them, making them perfect for the ad" on Backpage. In no time, the ad was posted by defendant. It contained pictures of Emily with a caption listing a fake name and her height and weight and claiming that she was "new to the area and looking for a few good men to spend some quality time with[,]" and "guaranteed to please." The ad then listed two phone numbers: defendant's and Melia's. The two had made an agreement that they would evenly split any money they made from selling Emily's services each day.

Mere minutes after the ad went up on Backpage, "men looking for sex" started calling on each of their phones. The defendant would hand the phone to Emily to answer their calls. He also provided her with a script, listing directions to his house and the sexual acts that she would offer to perform, with corresponding prices. The defendant instructed Emily to relieve the men of their money as soon as they walked through the door. "At least five or six" men showed up the first day.

That first night, defendant fell asleep in the living room, so Melia and Emily took defendant's bedroom. At almost two o'clock in the morning on April 18, Melia received a text message from defendant: "Hey Mark how you know that I didn't want to sleep in my bed. Damn you could have asked. Anyway, tell baby I need to f**k real fast. Then you[] guys can have the bed. Mark, I need to f**k." Melia then got up and told Emily he was going to take a shower. All of a sudden, defendant entered the bedroom and got on top of Emily, who was lying in bed in a t-shirt and underwear. Emily resisted again, telling defendant to stop and pushing on his chest.

But again, she could not stop him. The defendant pulled Emily's underwear to the side and penetrated her.[5]

The next day, defendant put Emily back to work. Whenever a man showed up, Emily would answer the door. The defendant and Melia would then hide in the back hallway. The defendant taught Emily to take the man's money, bring him into the bedroom, put the money in a bedside drawer, and then perform whatever sexual act the man had purchased. Meanwhile, defendant and Melia were listening, and they could hear when the man left. In between customers, defendant would enter the bedroom, take the money, and change the sheets. Then it would happen all over again, upwards of fifteen times per day in Emily's estimation.

However, things did not go according to plan for Melia. Almost immediately, Melia and defendant started to argue over the money. According to Melia, the pair was supposed to share the earnings on a daily basis, but Melia never saw a cent. When Melia confronted him, defendant became possessive: "This b***h is going to get me my money[.]" At that point, Melia had had enough, and he decided to leave. But defendant would not let Emily leave with him.

As a result, the horrors continued for Emily. At some point, a first-time customer, closer in age to Emily, a nineteen-year-old named Jeremy, appeared to be Emily's savior. He told her he had a place for her to stay and that he would buy her food and clothes. He returned to defendant's house to see Emily a second time, and then a third time. That last visit, Emily left with Jeremy. She escaped out the front door with him once defendant went to wait in the back hallway, thinking it was just another customer. Realizing what was happening, defendant ran outside, screaming, "What are you doing with my girl?" Nevertheless, Emily was able to get away. She and Jeremy traveled to Massachusetts.

---

[5] This act formed the basis for the third count of first-degree sexual assault.

But Jeremy turned out to be no savior. Emily said that he started off treating her "[r]espectfully." He even brought her to a movie, the first one she had seen in a theater. Soon enough, though, Jeremy told Emily that "he wanted [her] to make him some money"—in other words, to do what she had been doing for defendant. When Emily would not oblige, Jeremy sent a text message to defendant, saying that Emily wanted to come back. He then drove her to defendant's house and simply dropped her off at the front door.

Immediately, things picked up where they had left off. The exact same protocol was followed for every customer, and defendant continued to provide condoms, lubricant, clothing, and food for Emily. In the meantime, defendant had also broadened his enterprise and found himself another girl, Brooklyn. The fact that defendant had two girls operating out of the same one-bedroom apartment quickly became problematic. On April 24, around 3:45 in the afternoon, defendant texted Brooklyn that Emily was "still with the date[.]" Brooklyn responded, "Yes, and my hundred dollar date is here. WTF." However, the scheduling problem did not continue.

That is so because, on that very same night, there was a knock at defendant's door. Thinking it was a customer, Emily opened it. To her surprise, standing in the doorway were two uniformed police officers. Emily's parents had reported to the Pawtucket police that she had run away weeks earlier and that someone had informed them that he had seen Emily's ad on Backpage. When Emily answered the door, she was frightened and gave the officers a false name. But the officers persisted because she matched the description of the runaway child; eventually she was forthright as to her identity. Emily was placed into custody as a result of an outstanding Family Court bench warrant. Brooklyn, too, was arrested for drug possession and placed in a police car. At that point, alone in defendant's apartment with one of the responding officers, Emily stated that defendant had been prostituting her.

At the Pawtucket police station, Emily was interviewed by a detective. She identified a photograph of defendant, and told the detective that defendant was the man who had been prostituting her and who had sexually assaulted her. After the interview, Emily was brought to the hospital for examination. Meanwhile, around two o'clock in the morning, several officers again converged on defendant's apartment. There was no response to their knocks, but they could hear a female crying inside. Fearing that the woman was being held against her will, the officers forced the door open. Inside, they found defendant and a woman; defendant was arrested.

On June 18, 2014, a grand jury indicted defendant on three counts of first-degree sexual assault (counts 1, 2, and 3), one count of sex trafficking of a minor (count 4), and one count of conspiring with Melia to commit the crime of sex trafficking of a minor (count 6).[6] He was then served with a habitual offender notice. The defendant moved to dismiss counts 4 and 6, the charges of sex trafficking of a minor and conspiracy, on the ground that the statute that he was charged with violating, § 11-67-6, was fatally flawed in that it failed to properly state a crime. After the motion was denied, the case proceeded to trial.

At trial, the state offered evidence that demonstrated that defendant had not allowed incarceration to bring a halt to his money-making endeavors. Approximately five months after his arrest, while he was being held at the Adult Correctional Institutions awaiting trial, defendant made several recorded telephone calls. On those calls, he could be heard bragging that he would "get outta" prison given the weakness of the state's case: "[A]ll they doin is gettin[g] these

---

[6] Melia was also indicted as a co-defendant on one count of sex trafficking of a minor and one count of conspiracy with defendant. He entered into a plea agreement with the state in exchange for his cooperation and testimony against defendant. On the charge of sex trafficking of a minor, Melia was sentenced to fifteen years at the ACI, with five to serve and the remainder suspended with probation; on the conspiracy charge, he received a concurrent ten-year sentence, again with five years to serve and the remainder suspended with probation.

girlfriends that I had over my house criminating themselves they ain't never busted no date over my house with them girls"; "there ain't no case if * * * you ain't got the clientele"; and "[w]hy would they want to come to [c]ourt and * * * say they been over my house and spent money." So, defendant said, he was planning to "be home a lot sooner than people think[.]" But, as the recordings reveal, being in prison had really hampered defendant's ability to earn money. First, he asked how the newest "fresh catch" was "standing up[.]" He then carried on about his craving to "move" a girl from in prison: "I gotta have somebody, I gotta have somebody trying to stack some kind of money for me * * * no bulls**t. You know? Pimping in the joint man!" The recording reveals that defendant found that remark to be humorous, repeating his brilliant idea and laughing. The defendant boasted that, if he was not incarcerated, he would "be moving b****es like crazy right now."

The defendant was convicted on all counts. He was sentenced to forty-five years at the ACI on each of the three counts of first-degree sexual assault, all to run concurrently; the maximum forty years' imprisonment on count 4, sex trafficking of a minor, to run consecutive to the sentences for the sexual-assault counts; ten years in prison for the conspiracy count (count 6), concurrent to the sentence for count 4; and an additional fifteen-year sentence as a habitual offender, consecutive to the sentences imposed on all counts.

## II

### Discussion

Before this Court, defendant claims the following errors. First, he argues that the trial justice erred in denying his motion to dismiss counts 4 and 6 of the indictment. The defendant argues that his motion should have been granted because (1) the statute under which he was charged, § 11-67-6, failed to state a crime and (2) count 4, which he asserts merely parroted the

plethora of verbs set forth in § 11-67-6, was duplicitous and denied him adequate notice of the criminal act he committed.[7]  Second, defendant contends that the trial justice erred in denying his motion to pass after Melia remarked while testifying that defendant "ran a prostitution sting right out of his apartment" and that defendant had a "long history" with prostitution.  Finally, defendant avers that the trial justice erred in admitting the recordings of certain telephone conversations he had had while he was being confined awaiting trial.  He argues that those recordings were (1) irrelevant to the crimes with which he was charged, (2) improperly admitted as character evidence under Rule 404(b) of the Rhode Island Rules of Evidence, and (3) should have been excluded under Rule 403 of the Rhode Island Rules of Evidence because they were unduly prejudicial.

### A

### The Motion to Dismiss

Count 4 of the indictment charged:

> "That [defendant] * * * on or about day or date between the 2nd day of April, 2014 and the 24th day of April, 2014, exact day and date unknown to the Grand Jurors, in the City of Pawtucket, in the County of Providence, did recruit, employ, entice, solicit, isolate, harbor, transport, provide, persuade, obtain, or maintain [Emily], a minor, for the purposes of commercial sex acts, in violation of § 11-67-6 of the General Laws of Rhode Island, 1956, as amended (Reenactment of 2002)."

Count 6 of the indictment further charged defendant with conspiracy to commit sex trafficking of a minor.  Section 11-67-6, which has since been repealed, provided, in pertinent part, that:

---

[7] "The term 'duplicity' refers to the joining of two or more offenses, however numerous, in a single count of an indictment." *State v. Saluter*, 715 A.2d 1250, 1253 (R.I. 1998).  As we have explained, one of the dangers of duplicity is that "[i]f an indictment is duplicitous, a general verdict of guilty will not reveal whether the jury found defendant guilty of only one crime and not the other, or guilty of both." *State v. Thibedau*, 157 A.3d 1063, 1077-78 (R.I. 2017) (quoting *Saluter*, 715 A.2d at 1253).

"(b) Any person who:
"(1) Recruits, employs, entices, solicits, isolates, harbors, transports, provides, persuades, obtains, or maintains, or so attempts, any minor for the purposes of commercial sex acts; or
"(2) Sells or purchases a minor for the purposes of commercial sex acts; or
"(3) Benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in subdivision (1) or (2); or
"(c) Every person who shall commit sex trafficking of a minor, shall be guilty of a felony and subject to not more than forty (40) years imprisonment or a fine of up to forty thousand dollars ($40,000), or both."

As noted above, before trial, defendant moved to dismiss counts 4 and 6 pursuant to Rule 12(b)(2) of the Superior Court Rules of Criminal Procedure. The defendant argued to the trial justice that those counts should be dismissed because they were based on a violation of § 11-67-6, a statute that he asseverated did not actually state a criminal offense. In defendant's view, the statute contained a gap between subsections (b) and (c) wherein the conduct described should have been defined as a crime, and, because it was not so defined, § 11-67-6 did not actually set forth a crime. The trial justice, however, disagreed. Employing the canon of construction that statutes of the same subject matter should be harmonized and read together, the trial justice turned to § 11-67-3 for guidance and concluded that it was clear that the General Assembly intended to criminalize sex trafficking of a minor, despite the failure of § 11-67-6 to explicitly say so.[8] In the trial justice's view, § 11-67-6 was ambiguous and not, as defendant had argued, without force and effect; therefore, she denied defendant's motion to dismiss.[9]

---

[8] Unlike G.L. 1956 § 11-67-6, § 11-67-3—which generally criminalized sex trafficking of all persons, not just sex trafficking of minors—did not contain a gap. Section 11-67-3, which also has since been repealed, stated that:

"Whoever knowingly:
"(a) Recruits, entices, harbors, transports, provides, or obtains by any means, or attempts to recruit, entice, harbor, transport[,]

- 11 -

On appeal, defendant's central argument is that count 4 of the indictment, which charged him with violating § 11-67-6, should have been dismissed under Rule 12(b)(2) because of the glaring infirmities of the statute. For that same reason, he argues that count 6 of the indictment, which charged him with conspiring to commit sex trafficking of a minor, should also have been dismissed because, in his view, there can be no conspiracy without an underlying crime. Whether § 11-67-6 encompasses a crime is a question of law that we review *de novo*. *State ex rel. Town of Tiverton v. Pelletier*, 174 A.3d 713, 718 (R.I. 2017) (stating that "questions implicating statutory interpretation are questions of law and are, therefore, reviewed *de novo* by this Court").

In 2009, the General Assembly amended chapter 67 of title 11, enacting P.L. 2009, ch. 188 and P.L. 2009, ch. 192. The section later codified as § 11-67-6, entitled "Sex trafficking of a minor," provided, in full:

> "(a) Definitions. As used in this section:
> "(1) 'Commercial sex act' means any sex act or sexually explicit performance on account of which anything of value is given, promised to, or received, directly or indirectly, by any person.
> "(2) 'Minor' refers to any natural person under eighteen (18) years of age.

> provide, or obtain by any means, another person, intending or knowing that the person will be subjected to forced labor in order to commit a commercial sexual activity; or
> "(b) Benefits, financially or by receiving anything of value, from knowing participation in a venture which has engaged in an act described in violation of § 11-67-2, or 11-67-3, is guilty of a felony and subject to not more than twenty (20) years imprisonment or a fine of not more than twenty thousand dollars ($20,000), or both; provided, however, that this subsection shall not apply to a 'victim' as defined in this chapter."

[9] Throughout the course of the case, defendant maintained his objection to counts 4 and 6. In addition to moving to dismiss, defendant moved for judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure; objected to the trial justice's jury instructions with respect to count 4; and moved for a new trial, citing the statute's shortcomings.

"(3) 'Person' includes an individual, corporation, partnership, association, a government body, a municipal corporation, or any other legal entity.

"(4) 'Sex act' means sexual intercourse, cunnilingus, fellatio, anal intercourse, and digital intrusion or intrusion by any object into the genital opening or anal opening of another person's body or the stimulation by hand of another's genitals for the purposes of arousing or gratifying the sexual desire of either person.

"(5) 'Sexually-explicit performance' means an act or show, intended to arouse, satisfy the sexual desires of, or appeal to the prurient interests of patrons or viewers, whether public or private, live, photographed, recorded, or videotaped.

"(b) Any person who:

"(1) Recruits, employs, entices, solicits, isolates, harbors, transports, provides, persuades, obtains, or maintains, or so attempts, any minor for the purposes of commercial sex acts; or

"(2) Sells or purchases a minor for the purposes of commercial sex acts; or

"(3) Benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in subdivision (1) or (2); or

"(c) Every person who shall commit sex trafficking of a minor, shall be guilty of a felony and subject to not more than forty (40) years imprisonment or a fine of up to forty thousand dollars ($40,000), or both.

"(d) Obstructs, or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section shall be guilty of a felony and subject to not more than twenty (20) years imprisonment, or a fine of up to twenty thousand dollars ($20,000), or both.

"(e) In a prosecution under this section, the government need not prove that the defendant knew the victim's age." Section 11-67-6 (2002 Reenactment); *see also* P.L. 2009, ch. 188, § 2; P.L. 2009, ch. 192, § 2.

Therefore, as written, § 11-67-6 contained a definitional section, a section describing various conduct, a penalty section, and two other sections relating to obstruction and knowledge of the victim's age. The defendant's issue is with the section that describes conduct, subsection (b).

In between subsections (b) and (c), there is something obviously missing. The parties have referred to this as the "hanging or." In subsection (b), there is a description of conduct, the

conduct which defendant was charged with committing in this case.[10]  However, after the so-called "hanging or" in subsection (b), § 11-67-6 jumps to subsection (c), the penalty section. What this case ultimately centers on is what this Court is empowered to do about that gap.

The defendant contends that the language missing from the statute—language stating that the conduct described therein amounts to the crime of sex trafficking of a minor—renders it fatally flawed.  He suggests that it was necessary for the General Assembly to have included language in § 11-67-6 to the effect of "shall be guilty of the felony of sex trafficking of a minor." Thus, defendant maintains that, without words to that effect, § 11-67-6 lacks the force of law. The defendant further argues that if, as the trial justice ruled, the gap in § 11-67-6 renders its statutory language ambiguous, this Court should apply the rule of lenity and construe its terms narrowly and in his favor.

On the other hand, the state argues that the statute, while admittedly awkwardly drafted, is not so deficient as to render it unenforceable.  Relying on the fact that § 11-67-6 contains a penalty section, the state avers that the statute clearly and unambiguously states a crime—that is, sex trafficking of a minor.  Alternatively, the state contends that, if we consider § 11-67-6 to be ambiguous, then we, as the trial justice did, should employ the tools of statutory construction to effectuate what was the plain intent of the General Assembly in enacting § 11-67-6: to criminalize sex trafficking of a minor.

Generally, where the language of "a statute is susceptible of more than one reasonable meaning[,]" it is ambiguous.  *Drs. Pass and Bertherman, Inc. v. Neighborhood Health Plan of*

---

[10] Specifically, as delineated in the bill of particulars, the state alleged that defendant violated § 11-67-6 by recruiting, employing, enticing, soliciting, isolating, harboring, transporting, providing, persuading, obtaining, or maintaining Emily for the purpose of commercial sex acts. Before trial, the state agreed to eliminate the terms "persuade" and "obtain" from the jury instructions.

*Rhode Island*, 31 A.3d 1263, 1269 (R.I. 2011). And, when confronted with ambiguous statutory language, we turn to our familiar tools of statutory construction in an effort to effectuate the intent of the General Assembly. *In re Proposed Town of New Shoreham Project*, 25 A.3d 482, 505 (R.I. 2011). Here, however, there is no ambiguity, no language that is susceptible of more than one reasonable meaning, no language to construe. The gap after the "hanging or" in § 11-67-6(b) is a statutory flaw that cannot be repaired without the addition of language that criminalizes the conduct described in the statute, a task that goes beyond statutory construction and strays into the realm of statutory draftsmanship. Therefore, we are compelled to conclude that § 11-67-6 failed to state a crime, and that defendant's motion to dismiss counts 4 and 6 of the indictment should have been granted.

There is no doubt that, subject to constitutional limitations, the General Assembly is vested with immense power to define criminal offenses. *State v. Saluter*, 715 A.2d 1250, 1255 (R.I. 1998); *Hazard v. Howard*, 110 R.I. 107, 111, 290 A.2d 603, 606 (1972); *State v. Jorjorian*, 82 R.I. 334, 339, 107 A.2d 468, 470-71 (1954). As we said long ago,

> "[i]t is well settled that the legislature has the right of control in all matters affecting the public safety, morals, health and welfare, on the ground that such exercise of power falls within the police power of the State, which is vested exclusively in the legislative branch of the State government. A power of such broad and varying scope is also incapable of exact definition." *Creditors' Service Corp. v. Cummings*, 57 R.I. 291, 303, 190 A. 2, 10 (1937).

Nonetheless, while the Legislature's power to define crimes may be broad and difficult to channel by definition, it is also true that, to achieve the force and effect of law, the Legislature must actually define the acts it intends to punish as crimes. After all, it is well-settled law that "a crime is made up of two parts, forbidden conduct and a prescribed penalty." 1 Wayne R. LaFave et al., *Substantive Criminal Law* § 1.2(d) at 18 (3d ed. 2018). "The former without the latter is

no crime." *Id.* at 18-19. It follows, then, that the latter, a prescribed penalty, without the former, forbidden conduct unequivocally defined as an offense, also is no crime. *See id.* Just as we have held that every criminal statute must contain a penalty, *State v. DelBonis*, 862 A.2d 760, 768 (R.I. 2004), so too must every criminal statute state what constitutes a crime. In this respect, § 11-67-6 is fatally deficient because it is missing one of the two essential components of an effective criminal statute—the statement that the acts that it describes are crimes.

The paucity of caselaw on this topic should come as no surprise and lends further credence to its elemental nature in the law. Indeed, our caselaw in this area has focused only on criminal statutes that have failed to contain a penalty. *See, e.g.*, *State v. Tessier*, 100 R.I. 210, 211, 213 A.2d 699, 699 (1965) (recognizing "the hornbook principles that every criminal statute must provide for a penalty and that a conviction for a violation of a statute containing none cannot stand"). However, our research reveals one court that has confronted a criminal statute that was similarly afflicted with an egregious drafting error. In *State v. Archuletta*, 526 P.2d 911 (Utah 1974), the Utah Supreme Court considered a statute which provided, in pertinent part, that "[a] person commits aggravated assault if he commits assault as defined in § 76-5-101." *Archuletta*, 526 P.2d at 911. However, § 76-5-101 did not define the term "assault." What it actually defined was the term "prisoner." *Id.* Noting that "[t]his [was] an obvious statutory error[,]" the Utah Supreme Court reasoned that "[t]he legislature undoubtedly meant to have Sec. 76-5-103(1) read, 'A person commits aggravated assault if he commits assault as defined in section 76-5-102,' etc." *Id.* at 911-12. Yet, as that court concluded, although the Utah legislature may have intended to criminalize aggravated assault, it had not actually done so, and, as a result, the trial court's decision to quash the criminal information was affirmed. *Id.* at 912.

In *Archuletta*, the Utah Supreme Court provided concise reasoning that we embrace as persuasive here. As that court explained, "[t]he statute does not set forth the crime of aggravated assault at all. Even though the rule of strict construction of a criminal statute is not the law in Utah,[] there is nothing to construe where there is no ambiguity in the statute." *Archuletta*, 526 P.2d at 912. Significantly, as the court held: "There is nothing ambiguous about the statute in the instant matter; it simply does not state a crime, and we are not empowered to state one for the legislators simply because it seems certain that they intended to state one themselves." *Id.* We conclude that the same is true in this case.

Here, too, our Legislature's statute, § 11-67-6, is afflicted with an obvious drafting error. The General Assembly listed a range of conduct in subsection (b), cut short by the so-called "hanging or," and a penalty provision in subsection (c). It is likely true that, after the "hanging or" in § 11-67-6, the Legislature intended to include language linking the conduct that it described in subsection (b) to the felony punishment that it provided in subsection (c). But, as was the case in *Archuletta*, the Legislature's intent to create a crime does not overcome its overt failure to do so.

It is well settled that the power to define crimes rests not with this Court, but with the General Assembly. *Saluter*, 715 A.2d at 1255. As we have explained, "[n]o authority exists for this Court or the trial court in a criminal case 'to supplement or to amend a statute enacted by the General Assembly.'" *DelBonis*, 862 A.2d at 768 (quoting *State v. Carter*, 827 A.2d 636, 644 (R.I. 2003)). Section 11-67-6 fails to state a crime, and for us to view that statute as the state urges us, we would be required to redraft it, not merely to interpret or construe it. That, plainly, we cannot do. *Id.* (citing *State v. Calise*, 478 A.2d 198, 201 (R.I. 1984), for the proposition that

"this Court has neither the authority nor the competence to rewrite a penal statute to conform to the state's concept of how it should have been written").[11]

In our opinion, no amount of statutory construction in this case can fill the gap or repair the flaw created by the absence of language setting forth a crime in § 11-67-6. As we have explained above, a criminal statute's inclusion of a punishment without the inclusion of a criminal offense is a statute without any force and effect. *See Archuletta*, 526 P.2d at 912. This Court does not draft laws, it interprets and construes them. We simply cannot construe that which is not there to be construed.[12] Accordingly, count 4 of the indictment, which charged defendant with violating § 11-67-6, and count 6 of the indictment, which charged him with conspiring to violate § 11-67-6, should have been dismissed pursuant to Rule 12(b)(2).[13]

---

[11] Of note, in 2017, the General Assembly repealed § 11-67-6 when it repealed the entirety of chapter 67 of title 11, replacing that chapter with a new statutory scheme aimed at criminalizing human trafficking, codified as G.L. 1956 chapter 67.1 of title 11. *See* P.L. 2017, ch. 232; P.L. 2017, ch. 260. It is also noteworthy that, in 2015, the General Assembly amended § 11-67-6, leaving alone the gap contained in subsection (b), but increasing the punishments contained in subsections (c) and (d), *see* P.L. 2015, ch. 42, § 1; P.L. 2015, ch. 45, § 1, calling to mind the maxim that this Court "presume[s] that the General Assembly knows the state of existing relevant law when it enacts or amends a statute." *Power Test Realty Company Limited Partnership v. Coit*, 134 A.3d 1213, 1222 (R.I. 2016) (quoting *Retirement Board of Employees' Retirement System of Rhode Island v. DiPrete*, 845 A.2d 270, 287 (R.I. 2004)).

[12] In response to our dissenting colleague's reference to Justice Oliver Wendell Holmes' artful quote in *Roschen v. Ward*, 279 U.S. 337, 339 (1929), we pause to note that, in our view, that case—and, in turn, that quote—is inapposite here. *Roschen* was a civil case in which injunctive relief was sought, and it centered on whether a statute regulating the sale of eyeglasses could be interpreted in a way that was broader than the words of the statute allowed. *Roschen*, 279 U.S. at 339. Here, however, we have an incomplete criminal statute, one which the *Roschen* court agrees is subject to a more exacting scrutiny. *Id.* ("We agree to all the generalities about not supplying criminal laws with what they omit * * *."). Respectfully, there is a difference, in our opinion, between a court "using common sense in construing laws as saying what they obviously mean[,]" *id.*, and a court supplying language setting forth one of the two fundamental elements of a valid criminal statute where none exists. We agree that common sense dictates that the General Assembly intended to criminalize sex trafficking of a minor; however, we disagree with the dissent that the General Assembly actually did so.

[13] We agree with defendant that, although the crime of conspiracy is itself a separate offense, count 6 should also have been dismissed because without count 4, there was no underlying crime

**B**

**Melia's Remarks**

Next, defendant contends that the trial justice erred when she denied his motion to declare a mistrial after Melia said on the witness stand that defendant "ran a prostitution sting right out of his apartment" and that defendant had a "long history" with prostitution. At the outset, the record reveals that, following each of those remarks, defendant immediately objected and moved to strike. Each time, the trial justice granted defendant's motion to strike and issued a cautionary instruction, instructing the jurors that they were not to use Melia's testimony regarding any uncharged crimes "as evidence that [defendant] acted in conformity with that other behavior" or "as evidence that [defendant] acted in conformity with those prior acts on the dates in question[,]" respectively. Shortly after the trial justice struck Melia's comment regarding defendant's "long history" with prostitution, Melia and the prosecutor engaged in the following colloquy:

> "[PROSECUTOR]: Let me just ask you. Do you think this would be something that the Defendant would be interested in?
> "[MELIA]: Hundred percent, yes.
> "[PROSECUTOR]: And had he ever had a conversation with you about that previously?
> "[MELIA]: About —
> "[PROSECUTOR]: About bringing a girl to his house.
> "[MELIA]: Yes."

---

on which to base the conspiracy charge. *See* G.L. 1956 § 11-1-6 ("Except as otherwise provided by law, every person who shall conspire with another *to commit an offense punishable under the laws of this state* shall be subject to the same fine and imprisonment as pertain to the offense which the person shall have conspired to commit, provided that imprisonment for the conspiracy shall not exceed ten (10) years." (emphasis added)). Moreover, because we hold that defendant should have prevailed on his argument that § 11-67-6 failed to state a crime, we need not address his duplicity argument. Finally, we decline to, as the state suggests in its brief, find defendant guilty of the lesser-included offense of general sex trafficking, in violation of § 11-67-3. In this case, the jury was not instructed on a violation of § 11-67-3, and we will not unilaterally impose a conviction on that ground now.

- 19 -

Defense counsel then asked for a sidebar and moved to pass the case.

At sidebar, defense counsel argued that Melia's characterization of defendant was unduly prejudicial. Specifically, he said:

> "It just seems that the Prosecution is portraying my client as an ongoing pimp operation, and I think that this type of characterization is unfair to the Defendant and more so it's overly prejudicial. If it were the first time, I'm okay with it. But it appears that this is going to be an ongoing problem with this particular witness."

After explaining that she had already stricken Melia's remarks and that she was allowing Melia's other testimony about defendant's interest in prostitution solely as evidence of Melia's state of mind—namely, to explain why Melia had brought Emily to defendant's apartment—the trial justice denied the motion to pass. On appeal, defendant argues that that was done in error. We disagree.

It is well settled that "[a] trial justice's ruling on a motion to pass the case 'is entitled to great weight.'" *State v. Rosario*, 14 A.3d 206, 214 (R.I. 2011) (quoting *State v. Grant*, 946 A.2d 818, 826-27 (R.I. 2008)). Therefore, "[o]n appeal, a trial justice's ruling on a motion to pass the case 'will be disturbed * * * only if he or she was clearly wrong.'" *Id.* (quoting *Grant*, 946 A.2d at 827). We discern no such error here.

## C

### The Telephone Conversations

The defendant's final contention is that the trial justice erred in admitting recordings of certain telephone calls that he had made from the ACI while he was awaiting trial. However, after a careful review of the record, it is our opinion that this issue has been waived. It is no secret that "[t]his Court staunchly adheres to the 'raise or waive' rule." *State v. Barros*, 148 A.3d 168, 174 (R.I. 2016) (quoting *State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011)). "As we

have said on innumerable occasions, 'a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.'" *Id.* at 172 (quoting *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008)). "[T]o satisfy the strictures of our 'raise-or-waive' rule, an evidentiary objection must be sufficiently focused so as to call the trial justice's attention to the basis for said objection * * *." *Id.* (quoting *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009)). That requirement is grounded, in part, in our rules of evidence, which direct "that a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made." *Id.* (citing Rule 103(a)(1) of the Rhode Island Rules of Evidence).

Our review of the record in this case shows that defendant did not lodge an objection specific enough to escape the Damoclean swing of our raise-or-waive rule. During the trial, after attempting to introduce testimony unrelated to this issue, the state requested another sidebar. At sidebar, the state informed the trial justice that it wished to play recordings of phone calls that defendant had while he was at the ACI awaiting trial. To guide the jury, the state had transcripts of those recordings on hand. After the state made its request, the trial justice asked counsel for defendant whether he had any objections. Defense counsel's response was brief: "Well, the first four pages [of the transcripts], I'm not so sure that the material is really relevant unless you have someone who can interpret some street language."

The sidebar continued, with the trial justice peppering the state with several questions, such as, "Who was [defendant] talking to * * *?" and "[W]here is the relevance?" After the state explained the context of the phone calls, the trial justice then mentioned Rule 404(b), asking, "is it my understanding that the transcripts or the actual recording is going to be offered under [Rule] 404(b) to show signature crime, a design, an MO, that he is someone who panders even when he's inside the ACI? Is that what you're telling me about?" The state answered, "Yes."

As the sidebar was wrapping up, defense counsel then told the trial justice: "I'm here at the bench and I'm running into [Rule] 404(b) walls." The trial justice responded: "Well, your exception is noted, sir. * * * Overruled."

With the sidebar complete, the state then put an employee of Global Telling Company on the stand, through whom the state would introduce the disk containing the recordings of defendant's phone calls.[14] After the state established a foundation for admitting the disk, it moved to admit the disk as a full exhibit. As defendant began to object, the trial justice asked him, "For the reasons discussed at sidebar?" He responded: "Yes, for the same reasons." The trial justice overruled defendant's objection, and the recordings were admitted into evidence and played for the jury.

Based on the generalized nature of those objections, it is our opinion that the defendant has waived his ability to challenge the trial justice's decision to admit the recordings on the grounds that they (1) were irrelevant; (2) were improperly admitted under Rule 404(b); and (3) should have been excluded under Rule 403. Other than generally stating at sidebar that he was "running into [Rule] 404(b) walls[,]" and thereafter relying on that broadly-worded objection as the basis for objecting when the state moved to admit the disk of recordings as a full exhibit, defense counsel remained silent. In our view, the content of the colloquy at sidebar, even when coupled with the defendant's later objection, was insufficient to properly preserve this matter for appellate review. *See State v. Blandino*, 171 A.3d 21, 29 (R.I. 2017). Accordingly, we consider the issue to be waived. *See Barros*, 148 A.3d at 172.

---

[14] Global Telling Company is a company that provides phone systems for individuals to make calls while they are imprisoned in the ACI. As shown in this case, those calls are recorded.

**III**

**Conclusion**

For the reasons set forth in this opinion, we vacate the judgment of conviction with respect to counts 4 and 6.  We affirm the judgment in all other respects.  The papers shall be returned to the Superior Court.


**Justice Robinson, concurring in part and dissenting in part.**  I concur in the several holdings set forth in the majority opinion, and I also concur in the reasoning underlying those holdings—except that I respectfully but quite vigorously dissent from the majority's decision to vacate the convictions on Counts Four and Six, and I disassociate myself from the majority's reasoning in that regard.  While I appreciate the thoughtfulness with which the majority has reached its conclusion that the statute at issue in this case[1] contains a "flaw that cannot be repaired without the addition of language that criminalizes the conduct described in the statute," I simply cannot agree that such additional language is *necessary* for the purpose of giving fair notice as to what conduct is prohibited and as to what criminal penalties may be imposed on a person who engages in such conduct.  In my judgment, a reading of the statute in its entirety makes it clear precisely what conduct is being criminalized and what would be the penalty for committing the crime. I candidly acknowledge that there is an obvious incompleteness about the statute; undoubtedly, the drafter had planned to add a phrase after the rather notorious "hanging

---

[1]    The statute at issue is G.L. 1956 § 11-67-6, and it is quoted in full in the majority opinion.  The majority perceives a fatal "flaw" in that statute, which is the basis for the majority's conclusion that the convictions on Counts Four and Six must be vacated.

or."[2] However, that negligence on the drafter's part does not alter the fact that it is clear and unambiguous from a perusal of the statute as a whole precisely what acts constitute sex trafficking of a minor and what the range of penalties for engaging in those acts is.

In my approach to the important question of statutory interpretation that this case poses, I have been guided by the following insightful and eloquent summary of certain basic principles:

> "Our paramount task in construing a statute is to ascertain the intent behind its enactment and to effectuate that intent whenever it is lawful and within the competence of the Legislature. * * * In order to ascertain the legislative intent, we examine the language, nature, and object of the statute. * * * In the construing of a statute, it is also permissible to consider the reasonableness of the result of a particular interpretation." *Dunne Leases Cars & Trucks, Inc. v. Kenworth Truck Co.*, 466 A.2d 1153, 1156 (R.I. 1983).[3]

I begin the substantive portion of this partial dissent by stating that I fully agree with the majority's clearly stated view that the statute in question is unambiguous.[4] Where I part company with the majority is with respect to its further holding that something essential is absent from the otherwise unambiguous statute—namely, explicit language in the statute to the effect

---

[2] This is by no means the first time that the courts have been confronted with an imperfectly drafted statute. *See, e.g.*, *Town of East Greenwich v. O'Neil*, 617 A.2d 104, 108 (R.I. 1992) ("Legislative enactments are not always models of style and drafting.").

[3] *See also Alessi v. Bowen Court Condominium*, 44 A.3d 736, 740 (R.I. 2012) ("In matters of statutory interpretation our ultimate goal is to give effect to the purpose of the act as intended by the Legislature.") (internal quotation marks omitted); *Berthiaume v. School Committee of City of Woonsocket*, 121 R.I. 243, 247, 397 A.2d 889, 892 (1979) ("Our construction of statutory language is guided by the proposition that the intent of the Legislature controls. That intent is discovered from an examination of the language, nature, and object of the statute.").

[4] The majority opinion is pellucidly clear as to its assessment of the unambiguous nature of the statute at issue: "Here * * * there is no ambiguity, no language that is susceptible of more than one reasonable meaning, no language to construe." I do not quarrel in the least with that characterization of the statute; however, I do take issue with the majority's position that further language (explicitly stating that the conduct at issue is criminal) is *necessary* rather than merely desirable.

that it is criminal conduct for one to engage in one or more of the described acts.[5] We have said, time and time again, that it is entirely legitimate to look to the *context* in which particular language occurs. In my judgment, it is important to take a step back in order to consider the overall context. *See, e.g.*, *Mendes v. Factor*, 41 A.3d 994, 1002 (R.I. 2012) ("The plain meaning approach, however, is not the equivalent of myopic literalism, and it is entirely proper for us to look to the sense and meaning fairly deducible from the context.") (internal quotation marks omitted); *see generally Davis v. Michigan Department of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And such an approach requires us to "consider the entire statute as a whole * * *." *Sorenson v. Colibri Corp.*, 650 A.2d 125, 128 (R.I. 1994); *see also Generation Realty, LLC v. Catanzaro*, 21 A.3d 253, 259 (R.I. 2011); *In re Brown*, 903 A.2d 147, 149 (R.I. 2006).

The overall context of the statute in question is that it was part and parcel of the code of criminal conduct; described a number of prohibited acts; and provided a range of punishments for one who committed one or more of those acts. It would, of course, have been even better if those acts were *explicitly* declared in so many words to be criminal. In my judgment, however, it is a totally fair and unavoidable inference from this unambiguous statute, when read in its entirety, that the described conduct was legislatively deemed to be criminal. *See Ryan v. City of Providence*, 11 A.3d 68, 71 (R.I. 2011) ("When we determine the true import of statutory

---

[5] The majority opinion focuses on what it describes as "[t]he gap after the 'hanging or' in § 11-67-6(b)," and it characterizes that gap as being "a statutory flaw that cannot be repaired without the addition of language that criminalizes the conduct described in the statute * * *." It is the thesis of this dissent that, while it surely would have been desirable to add such language so that the statute would contain every jot and tittle which perfect draftsmanship would call for, no such addition was *necessary* for the statute to suffice to give fair notice as to what conduct was proscribed and what the penalty would be for engaging in that conduct.

language, it is entirely proper for us to look to the sense and meaning fairly deducible from the context.") (internal quotation marks omitted). No logical legislative purpose would be served by explicitly setting forth a series of penalties to be imposed if the conduct were not criminal. I frankly do not see how the statute can be understood otherwise. Fair notice has been given.

The statute's title ("Sex trafficking of a minor") clearly and unambiguously denotes what is the focus and subject matter of the text of the statute.[6] The statute goes on, in subsection (a), to provide definitions of important terms. Then, in subsection (b), the statute makes it eminently clear in the following words what conduct is the focus of the statute:

> "Any person who:
> "(1)    Recruits, employs, entices, solicits, isolates, harbors, transports, provides, persuades, obtains, or maintains, or so attempts, any minor *for the purposes of commercial sex acts*; or
> "(2)    Sells or purchases a minor *for the purposes of commercial sex acts*; or
> "(3)    Benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in subdivision (1) or (2); or[.]" G.L. 1956 § 11-67-6(b) (emphasis added).

Despite the fact that nothing follows the final "or" in subsection (b), subsection (c) makes it clear what the penalty is for engaging in the conduct listed in subsection (b)—namely, "[e]very person who shall commit sex trafficking of a minor shall be guilty of a felony and subject to not more than fifty (50) years imprisonment or a fine of up to forty thousand dollars ($40,000), or both."

---

[6]    I am aware of the "general proposition of statutory construction" to the effect that "titles do not control the meaning of statutes." *Orthopedic Specialists, Inc. v. Great Atlantic & Pacific Tea Co.*, 120 R.I. 378, 383-84, 388 A.2d 352, 355 (1978). However, I make reference to the title in this instance *not to give meaning* to the unambiguous statutory language, but simply as further confirmation of the focus of the enactment.

In my judgment, subsection (d), while also not a model of meticulous drafting, clearly goes on to provide a different penalty for anyone who "[o]bstructs, or attempts to obstruct, or in any way interferes with or prevents the enforcement of this section * * *."

While intending no disrespect to the members of the majority, it is my impression that they have scrutinized § 11-67-6 as a law school professor of statutory draftsmanship in quest of perfection would scrutinize a statute rather than viewing that statute to be a sufficiently clear declaration of: (1) what conduct is prohibited; and (2) what may be the penal consequences for violating one or more of those prohibitions. While the statute at issue would have been *better* if it had specifically added language to the effect that engaging in such conduct was criminal, I do not believe that such additional language was *necessary*; the presence of criminal penalties in the same statute where particular activities of a sexual nature are itemized more than suffices to give the reasonable person fair notice that the referenced conduct is criminal in nature. It is my view that a common sense reading of § 11-67-6 gives fair notice of what is prohibited and what will be the consequences of violating that prohibition. *See Matter of Falstaff Brewing Corp. Re: Narragansett Brewery Fire*, 637 A.2d 1047, 1050 (R.I. 1994) ("[O]ur primary task in construing a statute is to attribute to the enactment the meaning most consistent with its policies and with the obvious purposes of the Legislature * * *."); *see generally United States v. Hutcheson*, 312 U.S. 219, 235 (1941) (referencing "the importance of giving 'hospitable scope' to Congressional purpose even when meticulous words are lacking").

The statute at issue does not involve the same sort of legislative omission that required us to reverse the conviction in the case of *State v. DelBonis*, 862 A.2d 760 (R.I. 2004). Unlike the situation in the *DelBonis* case, it is not necessary in the instant case "to supplement or to amend" the statute in order to dispel possible doubt as to what is prohibited and what the penalties are.

*DelBonis*, 862 A.2d at 768 (internal quotation marks omitted). The four corners of the statute at issue in the present case, for all its lack of absolute perfection in terms of draftsmanship, suffice to give fair and adequate notice.

A venerable and sagacious proverb declares: "The best is the enemy of the good."[7] I believe that that proverb applies to the situation now before us. Certainly, it would have been "best" if there had been no imperfections in the statute; but that does not mean that what is explicitly stated in the statute is not "good" in the sense of not being sufficient to give fair notice of what acts are prohibited and what the penalties for violation will be.

I conclude by recalling the following pertinent observation of Justice Holmes: "We agree to all the generalities about not supplying criminal laws with what they omit, but there is no canon against using common sense in construing laws as saying what they obviously mean." *Roschen v. Ward*, 279 U.S. 337, 339 (1929).[8]

For these reasons, I would affirm the convictions on Counts Four and Six, and I respectfully dissent from that portion of the majority opinion that reaches a contrary conclusion.

---

[7] According to an authoritative source, the quoted language was originally an Italian proverb that was quoted in Italian by Voltaire in a letter that he wrote to the Duc de Richelieu on June 18, 1744. The Yale Book of Quotations 791 (Fred R. Shapiro ed., 2006).

[8] *See also Peak v. United States*, 353 U.S. 43, 46 (1957) ("That seems to us to be the common sense of the matter; and common sense often makes good law.").

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Curtis Maxie. |
| **Case Number** | No. 2017-92-C.A.<br>(P1/14-1880A) |
| **Date Opinion Filed** | June 22, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Owen Murphy<br>Department of Attorney General |
| | For Defendant:<br><br>William T. Murphy, Esq. |