April 22, 2024

**Supreme Court**

No. 2022-152-C.A.
(P1/18-1289A)

| | |
|---|---|
| State | : |
| v. | : |
| Victor Tavares. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email: opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

| State | : |
| --- | --- |
| v. | : |
| Victor Tavares. | : |

Present: Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ.

**O P I N I O N**

**Justice Goldberg, for the Court.** The defendant, Victor Tavares (defendant or Tavares), was convicted by a jury on two counts of first-degree sexual assault in violation of G.L. 1956 §§ 11-37-2 and 11-37-3, and one count of conspiracy to commit first-degree sexual assault in violation of G.L. 1956 § 11-1-6. Tavares, who was *pro se* at trial and again on appeal, raises twelve issues for our consideration. For the reasons discussed below, we affirm the judgment of conviction.

# I

## Factual Background

On May 26, 2012, Mary, the complainant, attended a party at the home of Juanita Johnson (Juanita), commemorating Memorial Day weekend.[1]  At the time of trial, Mary was thirty-seven years old and described Juanita as her mother's best friend and someone Mary had known her entire life.  Juanita had four children, most notably, Franklin Johnson (Johnson) with whom Mary grew up and was particularly close.  Because of this close and longstanding family relationship, it was not uncommon for Mary to socialize with Juanita and her family members.

When Mary arrived at Juanita's home on May 26, 2012, it was daylight and approximately thirty to forty people were in attendance.  As guests continued to arrive, Mary mingled at Juanita's home, enjoying drinks and music, and talking to Juanita, Johnson, and other party guests.  Several hours after Mary arrived at the party, Johnson asked Mary to drive to Tavares's home—approximately one mile away—and bring Tavares to the party.  Mary knew Tavares through, *inter alia*, Johnson, and thus, she agreed.

---

[1] We refer to the complainant as Mary, a fictitious name, in order to preserve some measure of privacy.  We also refer to Juanita by first name to distinguish Juanita from her son, Franklin Johnson, who was a co-defendant in this matter.  We intend no disrespect.

The short ride to and from Tavares's home was uneventful, but that soon changed. After returning to the party, Johnson asked Mary if he could make her a drink. Mary accepted and Johnson delivered an alcoholic beverage mixed with juice. Mary consumed some of the mixed concoction, but she did not finish it. Instead, Mary described feeling "drunk but overly drunk in a way that I had never felt before[, t]hings started looking funny. Colors started looking funny. I was very dizzy, very nauseous." As Mary continued feeling ill, she excused herself from Juanita's and Johnson's company and went to find the bathroom.

Mary recounted that during the brief journey to the bathroom her "balance was all off" and compared the trek to "walking in a video game." When Mary entered the bathroom, she closed and locked the door. While the precise details concerning what transpired in the bathroom and for how long Mary was in the bathroom are neither certain nor material, Mary testified that she believed she passed out and was later "woken up by [Johnson] knocking on the bathroom door."

Mary testified that Johnson initially queried whether she was "okay." Thereafter, Mary recounted, Johnson "said he had a surprise for me, to come with him." Mary trusted Johnson so she unlocked and opened the bathroom door; Johnson subsequently led Mary to a nearby bedroom. After Mary and Johnson entered the bedroom, Johnson closed the bedroom door behind them; Tavares was lurking behind the now-closed bedroom door.

As the party and music continued outside the house, Mary testified, Johnson pushed her onto a mattress in the bedroom, pulled her dress up, and removed her underwear. According to Mary, Tavares exposed his penis and penetrated Mary's mouth, pulling out only after Mary bit him. Subsequently, Mary recalled that Johnson and Tavares both used condoms and penetrated her vagina. Mary testified that Tavares's and Johnson's actions were nonconsensual, explaining that she was "scared" and "so weak at that point" that "[n]o matter what, there [was] nothing I could do to -- I knew that there was nothing I could do to help myself." Mary further recounted that Tavares and Johnson held her down against the mattress as she cried and yelled for Johnson to "[p]lease, please stop. Please make him stop." The response: Tavares and Johnson laughed, and Johnson quipped, "[d]on't you love me, sis?"

The next morning, Mary awoke and was extremely groggy. She described finding her legs hanging off the mattress, her dress pulled up, and her underwear clenched in her hand. Mary also reported being in pain and bleeding from her anus but could not remember the sordid details from the prior evening or early morning. Mary searched the bedroom for her keys and cell phone. Although she was unsuccessful in locating those items, she did discover a used condom. Realizing that "something was wrong," Mary grabbed the condom and threw it in her bag. Mary then woke Johnson, who was asleep and propped up against the bedroom door. Mary

- 4 -

asked Johnson about her missing keys and cell phone; Johnson replied, "[y]ou should call [Tavares]."

Mary left Juanita's residence and headed on foot to Tavares's home. As Mary approached Tavares's residence, she began recalling images from the prior evening or early morning. Mary screamed, "[y]ou raped me. Come outside. You raped me." When Tavares exited his home, he approached Mary and handed her the car keys. Mary then walked back to her vehicle and drove home.

After arriving home, Mary recalled feeling "disgusting" and that her "skin was crawling." She showered four times but did not seek medical or law enforcement assistance that day because "I just wanted to forget that -- I didn't want to be at that point. I didn't want to even be existing at that point." Mary testified that among the many emotions she experienced at that time was betrayal because Johnson was "like a brother, someone I looked up to or someone that protected me."

Three days after the party, on May 29, 2012, Mary drove herself to Women & Infants Hospital (hospital). Once at the hospital, Mary was treated by Bethany D'Amico (Nurse D'Amico), a nurse in the emergency room, who was trained in conducting sexual assault medical examinations and collecting evidence. She extensively examined Mary using a sexual assault evidence collection kit; and, as part of Mary's medical treatment, Nurse D'Amico elicited information from Mary concerning the circumstances that brought her to the emergency room. Mary

recounted the events described above and identified the two assailants as Tavares and Johnson. Mary brought the clothes she was wearing on the evening of May 26, 2012, as well as the condom she retrieved on the morning of May 27, 2012. These items were collected by Nurse D'Amico for further examination and testing. Nurse D'Amico also documented bruising to Mary's upper left interior thigh, left exterior knee, right anterior knee, and right anterior thigh.

While at the hospital, Mary was interviewed by a police officer and identified Tavares and Johnson as the assailants. Approximately two weeks later, Mary appeared at the Providence Police Department to make an official statement. She met Detective William Corrigan and again identified Tavares and Johnson as the perpetrators, specifically detailing that Tavares penetrated her vaginally and orally.

During trial, Shawna Bradshaw (Bradshaw), a Rhode Island Department of Health (DOH) senior forensic scientist, testified concerning the analysis of several items for DNA, including swabs taken from the inside and outside of the condom. After Bradshaw obtained a DNA sample from the inside of the condom, the profile was submitted into the CODIS database.[2] The CODIS system generated a report

---

[2] Bradshaw explained that the CODIS database "is a combined DNA index system that's developed and run by the [Federal Bureau of Investigation]. It takes the unknown samples collected from crime scenes and using a computer software, compares them to the known samples collected from convicted offenders, arrestees."

indicating that the DNA profile extracted from the inside of the condom was a "match" with Johnson's DNA profile.

Bradshaw explained that, when the DOH receives a positive report from CODIS, such as in this instance, the DOH engages in a process to confirm the DNA results. Pursuant to this confirmatory process, Bradshaw retested and reconfirmed the results taken from the swab of the inside of the condom. Additionally, Bradshaw explained, in 2018, she tested and analyzed a new and known DNA sample from Johnson. Bradshaw compared Johnson's known DNA profile to the DNA profile extracted from the inside of the condom. A statistical analysis revealed that the probability that the DNA from inside the condom belonged to someone other than Johnson was one in 1.2 quintillion.

On or about May 21, 2018, a grand jury returned an indictment charging Tavares with two counts of first-degree sexual assault and one count of conspiracy to commit first-degree sexual assault. The same indictment charged Johnson with one count of first-degree sexual assault and one count of conspiracy to commit first-degree sexual assault.[3]

---

[3] Johnson pled nolo contendere to felony assault; and, as part of that plea agreement, the state dismissed, pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure, the charge of conspiracy to commit first-degree sexual assault brought against Johnson. Johnson was sentenced to ten years at the Adult Correctional Institutions, with three years to serve and the balance suspended, with ten years' probation.

On May 25, 2018, the state filed a violation report against Tavares in accordance with Rule 32(f) of the Superior Court Rules of Criminal Procedure.[4]  The violation report charged that on the basis of the conduct alleged in the May 21, 2018 indictment, Tavares had violated the terms and conditions of probation imposed for a prior conviction.  Over the course of seven days, a justice of the Superior Court held a violation hearing, at the conclusion of which Tavares was declared a probation violator.  Tavares appealed the probation-violation determination, which we affirmed.  *See State v. Tavares*, 251 A.3d 895, 898 (R.I. 2021) (mem.).

In September 2021, a jury trial ensued relating to the sexual assault and conspiracy allegations.[5]  The defendant represented himself during the Superior

---

[4] Rule 32(f) of the Superior Court Rules of Criminal Procedure states:

> "The court shall not revoke probation or revoke a suspension of sentence or impose a sentence previously deferred except after a hearing at which the defendant shall be afforded the opportunity to be present and apprised of the grounds on which such action is proposed.  The defendant may be admitted to bail pending such hearing.  Prior to the hearing the State shall furnish the defendant and the court with a written statement specifying the grounds upon which action is sought under this subdivision.  No revocation shall occur unless the State establishes by a fair preponderance of the evidence that the defendant breached a condition of the defendant's probation or deferred sentence or failed to keep the peace or remain on good behavior."

[5] Tavares filed a motion for a speedy trial on February 17, 2021, which the trial justice granted within ninety days of the motion being filed.  On April 19, 2021,

Court proceedings but had the benefit of standby counsel, who was present during all trial proceedings. Following the state's presentation of evidence, Tavares declined to present witnesses or evidence. A jury found him guilty on two counts of first-degree sexual assault and on one count of conspiracy to commit first-degree sexual assault. The trial justice sentenced Tavares to forty years at the Adult Correctional Institutions, with thirty years to serve, on the first-degree sexual assault convictions, the balance suspended, with forty years' probation and an additional ten years suspended, on the conspiracy to commit first-degree sexual assault conviction. All sentences were to be served concurrently.

On appeal, Tavares raises twelve issues. Additional relevant facts will be set forth as necessary.

---

Tavares filed a motion to dismiss pursuant to Rule 12(e) of the Superior Court Rules of Criminal Procedure for failure to obtain a speedy trial. At a hearing on May 10, 2021, the motion to dismiss was denied and the trial justice appropriately noted that "we are in the midst of a global pandemic and so there are additional layers of requirements in order to schedule a jury trial." These accommodations included the presiding justice needing to approve the trial date because of a limitation on the number of jurors who could be brought into the courthouse and the number of trials that could be conducted at any given time.

On appeal, Tavares does not challenge the timeliness of his trial or the trial justice's denial of the motion to dismiss for failure to obtain a speedy trial.

- 9 -

## II

## Raise-or-Waive Rule

Before reaching Tavares's substantive arguments, the state submits that several issues raised by defendant have not been properly preserved for appellate consideration. We have performed an exhaustive examination of voluminous material in response to the state's contention. Specifically, the state directs our attention to defendant's allegations that: (1) the state violated Rule 16 of the Superior Court Rules of Criminal Procedure; (2) the trial justice erred by allowing testimony concerning Johnson's DNA; (3) the trial justice improperly allowed prospective jurors from outside Providence County to participate in the venire or the jury; (4) the trial justice failed to apply the laches doctrine or declare G.L. 1956 § 12-12-17(a) unconstitutional; and (5) the trial justice improperly denied the motion for a new trial. The state does not assert the raise-or-waive doctrine with respect to defendant's contention that the trial justice improperly dismissed Juror 81 for cause or defendant's assertion that the trial justice erroneously denied the motion to correct an illegal sentence, but our review concludes that these two issues are also not properly before this Court for consideration.

It is beyond peradventure that "this Court staunchly adheres to the 'raise or waive' rule." *State v. Barros*, 148 A.3d 168, 174 (R.I. 2016) (brackets omitted) (quoting *State v. Figuereo*, 31 A.3d 1283, 1289 (R.I. 2011)). We have recognized

that the raise-or-waive rule "should not 'be dismissed as a pettifogging technicality or a trap for the indolent; the rule is founded upon important considerations of fairness, judicial economy, and practical wisdom.'" *Id.* at 175 (quoting *National Association of Social Workers v. Harwood*, 69 F.3d 622, 627 (1st Cir. 1995)). "The rule has 'the salutary effect of making the trial on the merits the "main event," so to speak, rather than a "tryout on the road," for what will later be the determinative' appellate review." *Id.* (deletion omitted) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

"As we have said on innumerable occasions, 'a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court.'" *Barros*, 148 A.3d at 172 (quoting *State v. Bido*, 941 A.2d 822, 829 (R.I. 2008)). We generally will not overturn a judgment based on an alleged error that was not brought to the attention of the trial justice. *See id.* at 175 n.5. "[T]o satisfy the strictures of our 'raise-or-waive' rule, an evidentiary objection must be sufficiently focused so as to call the trial justice's attention to the basis for said objection." *Id.* at 172 (deletion omitted) (quoting *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009)). And, we have observed, "a specific ground for an objection must be stated unless the reason for the objection is clear from the context in which it was made." *Id.* (citing R.I. R. Evid. 103(a)(1)). As detailed below, Tavares runs afoul of this long-established rule repeatedly.

- 11 -

# A

## The State's Failure to Call Witnesses Listed in Discovery

Tavares claims that the trial justice erred and should have granted a new trial due to the state's failure to comply with Rule 16(a)(6) of the Superior Court Rules of Criminal Procedure.[6] Tavares explains that during discovery, the state provided a list of approximately thirty expected witnesses, yet at the conclusion of the state's case, only seven witnesses testified. Such conduct, defendant contends, is inconsistent with our holding in *State v. Verlaque*, 465 A.2d 207 (R.I. 1983).

The state responds that defendant "did not raise this discovery claim at trial; the first time that he raised it was in his third motion for new trial, which he filed on December 13, 2021." Tavares does not sufficiently counter this averment, responding only that "[t]hroughout the course of the trial and pretrial [the trial justice] made it clear that it was the '[s]tate's ongoing obligation to update the [d]efense as to discovery.'" Thus, according to Tavares, "the issue was properly raised before the trial-court because the trial-court obligated the [s]tate to continuously update [defendant]."

---

[6] Based on our review and the context of Tavares's arguments, it appears Tavares intended to reference Rule 16(a)(7), which provides that, upon a written request by a defendant, the state shall permit the defendant to inspect, listen, copy, or photograph "[a] written list of the names and addresses of all persons whom the attorney for the State expects to call as witnesses at the trial in support of the State's direct case[.]"

In *State v. Cahill*, 196 A.3d 744 (R.I. 2018), we confronted a similar argument in which the defendant admitted that "he did not specifically reference Rule 16 during the trial or in his post-trial motion, but [argued] that 'the parties and the court were clearly discussing and referencing the obligation of the prosecution to provide advance notice of proposed expert testimony.'" *Cahill*, 196 A.3d at 753 (brackets omitted). We observed that "[t]he raise-or-waive rule imposes upon litigants a duty to raise all their claims for relief in the trial court and properly articulate them to a judge for a ruling." *Id.* (quoting *State v. Yon*, 161 A.3d 1118, 1128 (R.I. 2017)). "In the context of Rule 16 violations," this Court added, "we have held that a party must 'adequately express its Rule 16-based objection in a manner sufficient to afford the trial justice an opportunity to elicit further information and properly pass on the issue.'" *Id.* at 753-54 (brackets omitted) (quoting *State v. Stierhoff*, 879 A.2d 425, 435 (R.I. 2005)). As such, we rejected the defendant's argument that "everyone involved in the case was cognizant" of the Rule 16 issue, and we concluded that "[t]his general awareness and the brief colloquy * * * [were] insufficient to preserve the issue for appeal." *Id.* at 754.

Here, Tavares's reference to the trial justice's recognition of the state's continuing duty to supplement discovery is unavailing. A general awareness, instruction, or colloquy concerning the continuing duty to supplement discovery is insufficient to preserve Tavares's contention that the state violated Rule 16 when it

- 13 -

called only seven witnesses to testify from the list of approximately thirty expected witnesses provided during discovery. *See Cahill*, 196 A.3d at 754. At no point during the trial did Tavares raise this issue with sufficient particularity, nor does Tavares point to any such ruling by the trial justice prior to the decision on the last motion for a new trial, which the trial justice rendered on February 28, 2022.[7]

In fact, it was not until after the state rested its case that it became apparent that the state called only seven of the approximately thirty witnesses. By the time defendant raised this objection (either in his October 12, 2021 oral argument or in his December 13, 2021 written motion for a new trial), it had been waived for appellate purposes. *See, e.g.*, *State v. Vose*, 287 A.3d 997, 1007 (R.I. 2023) (concluding that the allegation that the state failed to call more than half of the

---

[7] The record evinces that Tavares filed motions for a new trial on October 7, 2021, October 12, 2021, and December 13, 2021. The October 7, 2021 and October 12, 2021 motions for a new trial were heard and decided on October 12, 2021. The trial justice observed that Tavares had timely filed the October 7, 2021 motion for a new trial, which was denied, and that the December 13, 2021 motion for a new trial was not timely filed.

With respect to the December 13, 2021 motion for a new trial, the trial justice did not deny the motion based on the timeliness issue, but instead addressed the merits of the motion for a new trial, which was denied. The timeliness issue is not before this Court. While the state suggests that the Rule 16 witness list issue was not raised until the December 13, 2021 motion for a new trial, our review finds that Tavares made a passing reference to the Rule 16 issue during the October 12, 2021 hearing. In any event, there is no dispute that the Rule 16 issue was not raised until post-verdict during a motion for a new trial and, therefore, for the reasons explained herein was not timely raised.

- 14 -

witnesses listed in discovery was "not raised until the defendant's motion for a new trial, [thus] it was not properly preserved"); *State v. Albanese*, 970 A.2d 1215, 1222 (R.I. 2009) ("Because such an argument was not made during trial, it cannot belatedly be asserted during the motion for a new trial."). As such, this issue is not preserved for our consideration and is waived.[8]

## B

## Introduction of Johnson's DNA Evidence

During trial, Bradshaw, the DOH senior forensic scientist, testified concerning the DNA samples obtained from the condom retrieved by Mary. Bradshaw testified that, in August 2012, she authored a report that concluded "[t]he DNA profile obtained from the condom's inside is consistent with an unidentified, single-source, male donor." Bradshaw later testified that, in 2018, the DOH received a known sample of Johnson's DNA. As Bradshaw explained, after analyzing the known sample, she authored a supplemental June 2018 report that concluded "[t]he

---

[8] This Court would be remiss if we did not point out that in Tavares's opening brief, defendant acknowledged that "[d]uring the discovery phase of trial the [s]tate provided a list of expected witness[es] and Mr. Tavares prepared for each witness because the [s]tate had fulfilled its obligation so that he could prepare a rigorous defense." Tavares also suggested the state's noncompliance with Rule 16 was deliberate, but he provided no evidence or argument to support the alleged deliberate noncompliance. Notwithstanding the foregoing, this allegation has no merit. *See State v. Oster*, 922 A.2d 151, 165 (R.I. 2007) (distinguishing *Verlaque* and describing the state's decision to reserve the right to call certain witnesses based on the possibility that certain "unforeseen circumstances" may occur as "entirely valid").

DNA profile obtained from the condom's inside is consistent with the reference profile from Franklin Johnson." Tavares claims that this DNA evidence was used to support Mary's claim that condoms were used during the sexual assault.

On appeal, Tavares argues that the state's use of Johnson's DNA evidence and Bradshaw's testimony, both in lieu of Johnson's live testimony, violated the Confrontation Clause of the United States Constitution and/or the Rhode Island Constitution. Tavares also claims that between August 2012 (when Bradshaw authored the original report) and June 2018 (when Bradshaw authored the supplemental report), Bradshaw changed her conclusion regarding the DNA profile developed from the condom. Additionally, Tavares finds fault—seemingly with Bradshaw's testimony and not any ruling by the trial justice—that Bradshaw did not conduct a statistical analysis regarding the probability that the DNA found on the outside of the condom belonged to Mary.

As the state points out, Tavares did not raise a timely objection during trial concerning the admissibility of these DNA-related issues. During Bradshaw's testimony, defendant made a total of four objections; three were sustained. The objection that was overruled did not bear on the issues Tavares presents on appeal, but rather concerned a document used to refresh Bradshaw's recollection concerning the dates certain evidence was submitted. Indeed, the only basis offered by Tavares for this overruled objection was "[t]hat document isn't from Miss Bradshaw."

Tavares offered no objections during the testimony of the second witness who presented DNA evidence, Karen M. Lynch, a principal forensic biology scientist who had been employed by the DOH.

Decisively, in his reply brief, Tavares admits that he "had no reason to object to evidence relating to Mr. Johnson's DNA being admitted because [defendant] was still expecting to confront Mr. Johnson."  Having effectively confessed that these issues were not raised during the state's case, Tavares responds to the state's waiver argument by focusing on a motion for a new trial in which he suggests that he raised various Confrontation Clause concerns regarding evidence or testimony pertaining to Johnson.  As we noted, *supra*, however, "[b]ecause such an argument was not made during trial, it cannot belatedly be asserted during the motion for a new trial."[9] *Albanese*, 970 A.2d at 1222.

---

[9] Tavares also mentions that he raised the DNA evidence issue during the motion for judgment of acquittal.  On appeal, Tavares does not challenge the denial of the motion for judgment of acquittal; thus this issue is waived.  *See, e.g.*, *Roe v. Gelineau*, 794 A.2d 476, 482 n.6 (R.I. 2002).  To the extent that Tavares otherwise seeks to raise an evidentiary issue for the first time on a motion for judgment of acquittal, such an effort is ineffective and untimely.  *See State v. Reyes*, 984 A.2d 606, 617 (R.I. 2009) (holding that defendant who did not object to evidentiary issue "has waived his right to challenge the admissibility of the officer's testimony, and we will not consider this argument in the context of the trial justice's denial of defendant's motion for judgment of acquittal").

Tavares never raised these objections during Bradshaw's testimony, nor did Tavares object to the admission of the two reports (the August 2012 and the June 2018) referenced by Bradshaw. Rather, Tavares cross-examined Bradshaw concerning the allegedly inconsistent reports, which Bradshaw explained was the result of receiving and analyzing, in 2018, a known DNA sample from Johnson. Tavares also cross-examined Bradshaw concerning the lack of a statistical analysis for Mary's DNA on the outside of the condom. Bradshaw testified that while the outside of the condom contained multiple DNA profiles, one of which was consistent with Mary's DNA profile, the DOH does not do a statistical analysis of the likelihood that the victim's DNA is "on the victim's evidence," because "I would expect to find her DNA on the condom." Although Tavares faults Bradshaw's testimony and testing, which he explored during cross-examination, Tavares does not challenge a decision by the trial justice. Thus, these issues are waived or otherwise not properly before this Court.

## C

### The Dismissal of Juror 81

Tavares contends that the trial justice erred in the manner in which Juror 81 was excused for cause. During voir dire, Juror 81 expressed uncertainty concerning whether she could be fair and impartial due to her mother's recent passing and the emotions associated with such an event. After a brief colloquy with Juror 81, the trial justice inquired whether Juror 81 could "assure us, based on those types of

emotions that you described, you can be fair and impartial to the defendant and the [s]tate in this case[.]" Juror 81 responded that she could provide no assurances, at which point the trial justice excused Juror 81 for cause, without further inquiry (or a request for further voir dire) from either party. Well after Juror 81 was dismissed—and indeed, after the venire and the panel were excused for the day—Tavares posed an objection to Juror 81's dismissal and engaged in the following colloquy:

> "THE DEFENDANT: Yes, Judge. I believe it was Juror Number 81. The [c]ourt usually allows us to go ahead and make any -- question the jurors, the potential jurors before they are excused. And that one specific juror, the [c]ourt excused the juror when she was really on the fence, didn't give a definitive answer whether or not she was incapable of being unbiased or -- what's that word? [10]
>
> "THE COURT: Fair and impartial?
>
> "THE DEFENDANT: Fair and impartial. I'm pretty sure if we had a chance to at least question her a little bit, we would have been able to see that she would be fair and impartial.

---

[10] Our review of the record finds that Juror 81 provided a definitive answer to the trial justice's question:

> "THE COURT: So you can't assure us, based on those types of emotions that you described, you can be fair and impartial to the defendant and the [s]tate in this case, correct?
>
> "JUROR NUMBER 81: Yes."

A trial justice who determines that a juror cannot be fair and impartial should disqualify that juror. *See, e.g.*, *State v. McDowell*, 685 A.2d 252, 255 (R.I. 1996).

"* * *

"THE COURT: * * * I just want to ask you, Mr. Tavares, are you basing your argument on equal protection in the sense that that particular juror was a person of color?

"THE DEFENDANT: Yes, Judge, that was going to be my next point, yes, because you can see there aren't any African American jurors."

The trial justice expressed doubt concerning the accuracy of Tavares's statement regarding the lack of racial diversity on the panel (at the time of the colloquy), stating, "I'm not sure I agree with that at all * * *." Notwithstanding the colloquy at trial, Tavares does not appear to challenge the dismissal of Juror 81 on equal-protection grounds and certainly does not develop an equal-protection argument in his written submissions to this Court. Accordingly, any equal-protection argument is waived. *See Drew v. State*, 198 A.3d 528, 530 (R.I. 2019) ("[S]imply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue.") (brackets omitted) (quoting *Dunn's Corners Fire District v. Westerly Ambulance Corps*, 184 A.3d 230, 235 (R.I. 2018)). Even if Tavares had developed an equal-protection argument on appeal, for the reasons discussed *infra*, it would meet the same raise-or-waive fate as the argument developed on appeal but untimely raised at trial, i.e.,

the trial justice's failure to allow the parties to voir dire Juror 81 prior to this juror being dismissed. We explain below.

On appeal, the state does not contend defendant failed to preserve the voir dire issue for our review and we acknowledge that after Tavares belatedly raised this issue, the trial justice stated that defendant's objection was noted for the record and "[i]t's preserved in the event of an appeal." However, we disagree with the trial justice's determination that Tavares's objection was properly preserved for appeal. *See, e.g.*, *State v. Nordstrom*, 529 A.2d 107, 111 (R.I. 1987) ("This [C]ourt on appeal is free to affirm a ruling on grounds other than those stated by the lower-court judge.").

This Court has recognized that the raise-or-waive rule "is founded upon important considerations of fairness, judicial economy, and practical wisdom." *Barros*, 148 A.3d at 175 (quoting *National Association of Social Workers*, 69 F.3d at 627). Among the principles supporting the fairness, economy, and wisdom considerations is the requirement that a party raise a specific objection at such an appropriate time and manner, thus "affording the trial justice with an opportunity to correct any potential error before the jury retires to deliberate." *Tancrelle v. Friendly Ice Cream Corporation*, 756 A.2d 744, 753 (R.I. 2000); *see also State v. Whitaker*, 79 A.3d 795, 808 (R.I. 2013) ("Because it was incumbent upon defendant to object to the instructions before the jury began its deliberations so that the trial justice might

have the opportunity to correct any errors, the failure to raise these objections at the appropriate time constrains us to conclude that they were not preserved for our review.").

Here, the record demonstrates that Tavares's belated objection was ineffectual because it provided no opportunity for the trial justice to consider the basis for the objection or to take corrective action. Significantly, after the trial justice excused Juror 81, this juror was dismissed; Tavares failed to pose an immediate objection and Juror 81 was replaced. Voir dire continued with four additional panel members being excused before the trial justice announced that court proceedings had ended for the day. It was after the venire and panel left the courtroom that Tavares raised the objection concerning the dismissal of Juror 81; but, by this time, Juror 81 was excused and additional court proceedings consisting of more than fifty transcript pages, as well as the disqualification of four additional prospective jurors, ensued. It was simply too late.

The tardiness of the objection and the lack of an opportunity to take remedial action is manifest in this record. After Tavares objected, the state countered that it was willing to have Juror 81 "come back." The trial justice rejected this suggestion and stated, "that's not obviously going to be possible. That juror was excused for cause * * *." Tavares's failure to raise this issue in a manner that would have

afforded the trial justice an opportunity to take corrective action convinces us that this issue is not properly before the Court.

Despite the foregoing conclusion, we nonetheless observe that "[t]he determination of the disqualification of a juror for cause is left to the discretion of the trial justice." *State v. Hazard*, 785 A.2d 1111, 1122 (R.I. 2001). Considering Juror 81's response that she could not assure the trial justice that she would be a fair and impartial juror, the trial justice did not abuse his discretion under these circumstances when Juror 81 was dismissed without a request for additional voir dire from the parties. *See id.* ("[T]he juror's equivocal responses to the court's inquiries about her ability to decide the case irrespective of her previous contacts with the defendant's former wife formed a sufficient basis to excuse her from the jury for cause.").[11] We therefore reject this allegation of error.

## D

### Inclusion of Non-Providence County Jurors

The defendant also contends that pursuant to G.L. 1956 § 8-7-2(1), the Superior Court operates two separate calendars, one for Providence County and the

---

[11] Tavares maintains that Juror 81 was the only juror excused by the trial justice without the parties having an opportunity to conduct voir dire. He is mistaken. Our review discloses that nine jurors, including Juror 81, were excused by the trial justice for cause without the parties having an opportunity to conduct voir dire.

second for Bristol County.[12]  Thus, Tavares surmises, "[t]here is no law that permits Bristol County [j]urors to try a matter on the Providence County Calendar.  Bristol County matters have their own calendar and a county of their own potential jurors." Because defendant contends that he has "a right to be tried before jurors from his own county," he urges this Court to vacate the conviction.  The state counters that Tavares failed to timely raise this issue and therefore it is waived; and in any event, defendant cites no legal authority to support his position.  We agree with the state's argument.

In addition to relying on this Court's raise-or-waive rule, *see supra*, we also note that G.L. 1956 § 9-10-17 provides that "[i]f a party knows of any objection to a juror before the case is opened to the jury and omits to suggest it to the court, he or she shall not afterwards make the objection, unless by express leave of the court." The state submits that Tavares failed to raise this issue until a post-trial motion for a new trial and Tavares offers no response to the state's argument.  Our review reveals no timely objection; accordingly, Tavares has waived this issue.  *See, e.g.*, *Barros*, 148 A.3d at 174-75.

---

[12] General Laws 1956 § 8-7-2(1) provides that every year the Superior Court shall be in session "[a]t Providence, for the counties of Providence and Bristol, on a continuous basis; provided, that the presiding justice shall determine the duration of the various court calendars[.]"  Tavares's contention that § 8-7-2(1) establishes separate calendars for Providence and Bristol Counties is wrong.

# E

## The Laches Issue and the Constitutionality of G.L. 1956 § 12-12-17(a)

Tavares maintains that the state possessed evidence in 2012 implicating him in the sexual assault but failed to return an indictment until 2018. Despite the lack of a statute of limitations for first-degree sexual assault, *see* § 12-12-17(a), defendant contends that the passage of time deprived him of the opportunity to obtain fresh evidence, thus requiring dismissal of the indictment. Tavares fails to reference any particular prejudice allegedly sustained. On appeal, defendant also suggests that § 12-12-17(a) is unconstitutional because it fails to make a distinction between felonies and/or fails to include all felonies.[13] Again, neither issue is properly preserved for appeal.

---

[13] General Laws 1956 § 12-12-17(a) provides:

> "There shall be no statute of limitations for the following offenses: treason against the state; any homicide, arson, first-degree arson, second-degree arson, third-degree arson, burglary, counterfeiting, forgery, robbery, rape, first-degree sexual assault, first-degree child molestation sexual assault, second-degree child molestation sexual assault, bigamy; manufacturing, selling, distribution, or possession with intent to manufacture, sell, or distribute, a controlled substance under the Uniform Controlled Substance Act, chapter 28 of title 21; or any other offense for which the maximum penalty provided is life imprisonment."

In his opening brief, Tavares indicates that the laches issue was raised during sentencing. After the state responded that raising the laches argument at sentencing was untimely and failed to preserve the issue for this Court's consideration, Tavares rejoined that "[t]he issue of the delay by the state was raised several times on different motions and the topic of the magistrate's appeal." Tavares fails to identify any "different motions" where this issue was raised before the trial justice, and we have reviewed defendant's memorandum in support of his appeal from the magistrate's decisions (as well as the July 16, 2019 transcript of the oral argument before the trial justice) and find no references to a laches argument. Tavares also fails to reference where in the trial record he challenged the constitutionality of § 12-12-17(a), nor does defendant counter the state's argument that he failed to raise the constitutional issue in the Superior Court.

Having carefully reviewed the record, neither the laches argument nor the constitutional contention was timely preserved or sufficiently developed on appeal. *See, e.g.*, *Barros*, 148 A.3d at 174-75; *Drew*, 198 A.3d at 530 (holding that failure to meaningfully develop an appellate argument constitutes waiver); *see also* Super. R. Crim. P. 12(b)(2) ("[D]efenses and objections based on defects in the institution of the prosecution or in the indictment * * * may be raised only by motion before trial."). We conclude that these issues are likewise waived.

- 26 -

# F

## Motion for a New Trial and Motion to Correct Sentence

Tavares challenges the trial justice's denial of the motion for a new trial and the motion to correct sentence. In support, defendant's opening brief states—in its entirety—"[t]he Defendant-Appellant submits exhibits I & J and incorporates all arguments made infavor [*sic*] of a new trial and correction of sentence. He also incorporates all foregoing arguments as grounds to vacate his sentence and grant a new trial."[14] In his reply brief, Tavares references the transcripts for the motion for a new trial filed in December 2021 and the motion to correct sentence, and he submits that "[m]eaningful discussion took place before the trial-court and transcripts have been filed." Tavares asserts that this Court should review both issues *de novo*. We decline to do so.

Even when a timely and sufficient objection is made in the trial court, this Court has nonetheless admonished that "simply stating an issue for appellate review, without a meaningful discussion thereof or legal briefing of the issues, does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver

---

[14] Exhibit I corresponds to the (third) motion for a new trial filed on December 13, 2021. Exhibit J corresponds to the motion to correct sentence filed on or about December 8, 2021. Exhibit J also contains a memorandum in support of the motion to correct sentence. Tavares also filed motions for a new trial on October 7, 2021, and October 12, 2021, both of which were denied and neither of which Tavares challenges on appeal.

of that issue." *Drew*, 198 A.3d at 530 (brackets omitted) (quoting *Dunn's Corners Fire District*, 184 A.3d at 235); *see also Terzian v. Lombardi*, 180 A.3d 555, 557 (R.I. 2018) ("We have consistently made it clear that, under our raise-or-waive rule, 'even when a party has properly preserved its alleged error of law in the lower court, a failure to raise and develop it in its briefs constitutes a waiver of that issue on appeal and in proceedings on remand.'") (brackets omitted) (quoting *McGarry v. Pielech*, 108 A.3d 998, 1005 (R.I. 2015)). This Court has also noted that "we will not scour the record to identify facts in support of the plaintiff's broad claims, and we will not give life to arguments that the plaintiff has failed to develop on his own." *Drew*, 198 A.3d at 530 (quoting *Terzian*, 180 A.3d at 558).

With respect to the motion for a new trial, Tavares makes no effort to elucidate an appellate argument or explain how the trial justice erred. Rather, defendant's entire appellate argument is to refer this Court to the Superior Court record. We have no trouble concluding that defendant's failure to meaningfully discuss and develop this issue on appeal "does not assist the Court in focusing on the legal questions raised, and therefore constitutes a waiver of that issue." *Drew*, 198 A.3d at 530 (quoting *Dunn's Corners Fire District*, 184 A.3d at 235).

We also have no hesitation concluding that defendant's argument that the trial justice improperly denied the motion to correct an illegal sentence is not properly before this Court. "It is well settled that this Court does not consider either 'the

- 28 -

validity or the legality of a sentence on direct appeal' unless extraordinary circumstances are present." *State v. Storey*, 102 A.3d 641, 649 (R.I. 2014) (quoting *State v. Ibrahim*, 862 A.2d 787, 793-94 (R.I. 2004)). Because defendant has failed to develop this issue on appeal, we conclude that he has not presented us with extraordinary circumstances, and thus, this issue is not properly before us on this direct appeal. *Id.*

### III

### Legal Analysis

Although the remaining issues are properly presented before this Court, the controlling law is well settled and adverse to Tavares's contentions. We therefore reject the remaining claims of error.

"When reviewing a decision on a motion to dismiss an indictment, this Court 'accords great weight to a trial justice's findings; we will not set them aside unless they are clearly erroneous or fail to do justice between the parties.'" *State v. Sivo*, 809 A.2d 481, 486 (R.I. 2002) (deletion omitted) (quoting *State v. Reed*, 764 A.2d 144, 146 (R.I. 2001)). Questions of law are reviewed *de novo*. *See State v. Laurence*, 848 A.2d 238, 250 (R.I. 2004).

# A

## The General Assembly's Enactment of Criminal Laws

Tavares acknowledges the General Assembly's constitutional authority to enact legislation,[15] but contends that this constitutional prerogative is limited to enacting legislation concerning corporations or the disposition of property pursuant to article 6, section 14 of the Rhode Island Constitution.[16] According to Tavares, if

---

[15] For this proposition Tavares cites article 10, sections 1 and 2, as well as article 6, section 2, of the Rhode Island Constitution. Article 10, section 1 provides that "[t]he judicial power of this state shall be vested in one supreme court, and in such inferior courts as the general assembly may, from time to time, ordain and establish." Article 10, section 2 provides:

> "The supreme court shall have final revisory and appellate jurisdiction upon all questions of law and equity. It shall have power to issue prerogative writs, and shall also have such other jurisdiction as may, from time to time, be prescribed by law. A majority of its judges shall always be necessary to constitute a quorum. The inferior courts shall have such jurisdiction as may, from time to time, be prescribed by law."

We observe that neither provision concerns the General Assembly or its powers. Article 6, section 2 states, in relevant part, "[t]he legislative power, under this Constitution, shall be vested in two houses, the one to be called the senate, the other the house of representatives; and both together the general assembly. The concurrence of the two houses shall be necessary to the enactment of laws."

[16] Article 6, section 14 states: "The general assembly may provide by general law for the creation and control of corporations; provided, however, that no corporation shall be created with the power to exercise the right of eminent domain, or to acquire franchises in the streets and highways of towns and cities, except by special act of

the framers intended the General Assembly to enact criminal laws, such authority would have been bestowed within article 6, section 14. Seemingly, Tavares contends that the General Assembly lacked the constitutional authority to enact the criminal statutes upon which he was convicted, and as such, he argues that the trial justice should have granted the motion to dismiss the indictment.[17]

"In assessing a challenge to the constitutionality of a statute, we begin with the principle that legislative enactments of the General Assembly are presumed to be valid and constitutional." *State v. Faria*, 947 A.2d 863, 867 (R.I. 2008) (brackets omitted) (quoting *Newport Court Club Associates v. Town Council of Middletown*, 800 A.2d 405, 409 (R.I. 2002)). "To be deemed unconstitutional, a statute must palpably and unmistakably be characterized as an excess of legislative power." *Id.* (quoting *Cherenzia v. Lynch*, 847 A.2d 818, 822 (R.I. 2004)). "Unless the party challenging the constitutionality of a statute can prove beyond a reasonable doubt that the act violates a specific provision of the Rhode Island Constitution or the

---

the general assembly upon a petition for the same, the pendency whereof shall be notified as may be required by law."

[17] On July 16, 2019, the trial justice heard and denied Tavares's motion to dismiss the indictment on the basis that the General Assembly did not have the constitutional authority to enact criminal laws, that he was not afforded the process set forth in the Superior Court Rules of Criminal Procedure, and that the state was collaterally estopped from prosecuting Tavares for sexual assault. These issues are addressed in Sections III.A, III.B, and III.C of this opinion.

United States Constitution, this Court will not hold the act unconstitutional." *Id.* (brackets omitted) (quoting *Cherenzia*, 847 A.2d at 822).

While Tavares claims the General Assembly is without authority to enact criminal laws, this Court has unequivocally rejected such a conclusion and recognized that "[t]here is no doubt that, subject to constitutional limitations, the General Assembly is vested with immense power to define criminal offenses." *State v. Maxie*, 187 A.3d 330, 339 (R.I. 2018). We have observed:

> "[I]t is well settled that the legislature has the right of control in all matters affecting the public safety, morals, health and welfare, on the ground that such exercise of power falls within the police power of the State, which is vested exclusively in the legislative branch of the State government. A power of such broad and varying scope is also incapable of exact definition." *Id.* at 339-40 (quoting *Creditors' Service Corp. v. Cummings*, 57 R.I. 291, 303, 190 A. 2, 10 (1937)).

Here, Tavares provides no legal authority to support the argument that the General Assembly's plenary powers do not include the authority to enact criminal laws, and such a conclusion is inconsistent with our precedent. *See Maxie*, 187 A.3d at 339-40; *Sosa v. State*, 949 A.2d 1014, 1016 (R.I. 2008) ("[I]t is the prerogative of the General Assembly to define criminal offenses and set forth the sentences for those crimes and that when it does so, the Legislature is not intruding upon the judicial function.") (quoting *State v. Monteiro*, 924 A.2d 784, 793 (R.I. 2007)).

While defendant avers that article 6, section 14 limits the General Assembly's legislative authority to "the creation and control of corporations," this express delegation in no way abrogates what this Court has repeatedly recognized as the General Assembly's "broad and plenary power to make and enact law, save for the textual limitations that are specified in the Federal or State Constitutions." *Benson v. McKee*, 273 A.3d 121, 132 (R.I. 2022) (quoting *East Bay Community Development Corporation v. Zoning Board of Review of Town of Barrington*, 901 A.2d 1136, 1150 (R.I. 2006)). Accordingly, after our *de novo* review, we reject defendant's contention that the General Assembly is without constitutional authority to enact the criminal laws upon which Tavares was charged and convicted, and conclude that the trial justice properly denied the motion to dismiss on such a basis.

**B**

**Commencement of Prosecution Through an Indictment**

On or about May 21, 2018, a grand jury charged Tavares with two counts of first-degree sexual assault and one count of conspiracy to commit first-degree sexual assault. Tavares suggests that it was error to indict him and insists that a criminal information or criminal complaint should have been used to initiate the prosecution, and that he should have been afforded the process associated with a criminal information or criminal complaint. For instance, Tavares argues that:

- 33 -

"By way of the R.I. Superior Court Rules of Criminal Procedure a criminal complaint must be filed by the Providence Police Department in the District Court (Rule 3 and RIGL 12-6-1). A warrant of arrest must be then issued based on the criminal complaint (Rule 4(b)[(]1)). Upon arrest the Defendant-Appellant was then suppose[d] to be brought before the District Court for his initial appearance (Rule 5(a)). Because the [s]tate was prepared to proceed to grand jury a preliminary examination hearing would not have been required, so long as a true-bill were returned within thirty (30) days. As an operation of law each court rule and statute governing procedure must be adhered to.

"Under the guise of a 'secret indictment' the [s]tate stripped Mr. Tavares of all his unalienable rights and Constitutional protections. An indictment in this matter was never returned, true-billed, before a judge in open court * * * nor did the [s]tate ever motion the justice to seal the indictment because there is no judge on record or docketed as having had this indictment returned before him true billed."

Based upon the absence of this process, defendant contends that the trial justice erred by not granting the motion to dismiss the indictment.

The citations referenced by Tavares are all predicated upon the initiation of criminal proceedings through a criminal information or a criminal complaint after an arrest.[18] Accordingly, the issue presented to this Court, at least initially, is

---

[18] *See* Super. R. Crim. P. 3 ("The complaint is a written statement setting forth the offense charged and shall be certified by the Office of the Attorney General or the authorized law enforcement agency."); Super. R. Crim. P. 4(a)(1) ("If it appears from the complaint, or from the statement or statements made and subscribed to before a judicial officer of the District Court or other officer empowered to issue warrants, that there is probable cause to believe that an offense has been committed and that the defendant has committed it, a warrant for the arrest of the defendant

- 34 -

whether Tavares was properly charged through an indictment, rather than through a criminal information or criminal complaint. Having carefully examined defendant's arguments, we conclude Tavares was properly charged through an indictment and the citations referenced by defendant are inapplicable.

Tavares was charged, *inter alia*, with two counts of first-degree sexual assault, in violation of §§ 11-37-2 and 11-37-3. Upon conviction of such an offense, a person "shall be imprisoned for a period not less than ten (10) years and *may be imprisoned for life*." Section 11-37-3 (emphasis added). Article 1, section 7 of the Rhode Island Constitution provides, in part, "no person shall be held to answer for any offense which is punishable by death *or by imprisonment for life unless on presentment or indictment by a grand jury * * *.*"[19] (Emphasis added.) Because Tavares faced the

_____

shall issue to any officers authorized by law to execute it."); Super. R. Crim. P. 5(a) ("Unless otherwise provided by statute, an officer making an arrest under a warrant issued upon a complaint shall take the arrested person without unnecessary delay before a judicial officer of the District Court as commanded in the warrant."); G.L. 1956 § 12-6-1 ("Whenever any complaint shall be made to any judge of the district court, or to any justice of the peace authorized to issue warrants within a division of the district court, of the commission of any offense within the division, he or she shall examine the complainant under oath or affirmation and require the complainant's statements to be reduced to writing and be subscribed and sworn to by the person or persons making them.").

[19] *See also* § 12-12-1.1 ("An offense which may be punished by a term of life imprisonment shall be prosecuted by indictment unless the defendant, with the consent of the attorney general and leave of the court, waives indictment, in which event it may be prosecuted by information."); Super. R. Crim. P. 7(a) ("An offense which may be punished by a term of life imprisonment shall be prosecuted by indictment.").

- 35 -

possibility of life in prison upon conviction for first-degree sexual assault, absent a waiver of the indictment after arrest, which did not arise in this case, the state was required to initiate this prosecution through an indictment. *See generally State v. Palmigiano*, 110 R.I. 576, 579, 295 A.2d 44, 45 (1972) ("While both the state and federal constitutions require an indictment by a grand jury before prosecution for any infamous crime, neither provision in any way precludes the state or federal government from affording the protection of a grand jury indictment when the accused is charged with a lesser offense."). Therefore, we conclude that Tavares was properly charged through a secret indictment and that the citations referenced by defendant concerning the process afforded after the issuance of a criminal information or criminal complaint are of no moment.

The defendant's remaining allegations are also refuted by the record. For instance, Rule 6(e)(4) of the Superior Court Rules of Criminal Procedure provides that "[t]he judicial officer to whom an indictment is returned may direct that the indictment be kept secret until the defendant is in custody or has been released pending trial or arraigned or presented on said indictment before a judicial officer."

The Superior Court docket reflects that on May 21, 2018, the indictment was returned by the grand jury in the Superior Court in Providence County and on the same day a "Criminal Case Action/Warrant for Commitment" document was filed in the Superior Court reflecting that the indictment was "to be sealed" and that a

"warrant issued." The "Criminal Case Action/Warrant for Commitment" document, as well as an electronic entry in the Superior Court case file, identified the justice of the Superior Court who ordered the indictment sealed and who issued the arrest warrant. On the following day, May 22, 2018, a clerk's note indicates that the indictment was "unsealed"; and on May 25, 2018, defendant appeared in open court for arraignment where he pled not guilty. Tavares also contends that a court reporter was never appointed to record the grand jury proceedings, but this claim is refuted by defendant's receipt of grand jury transcripts, which defendant acknowledged in open court. We discern no error.[20]

---

[20] The above analysis reflects our independent review on this appeal, which accords with our prior decision affirming the Superior Court's determination that Tavares violated the terms and conditions of probation based upon the conduct alleged in the May 21, 2018 indictment. *See State v. Tavares*, 251 A.3d 895, 896-98 (R.I. 2021) (mem.). In *Tavares*, we noted that defendant similarly challenged "the 2018 sexual assault indictment * * * contending that the 'indictment was never brought forth pursuant to the Rules of Procedure,' and that no complaint, determination of probable cause, or true bill was returned against him." *Id.* at 896-97 (brackets omitted). We rejected this claim and concluded:

> "[N]one of the defects claimed by defendant surrounding the 2018 sexual-assault indictment have arisen. A grand jury charged defendant with felony sexual-assault crimes on May 21, 2018, in P1/18-1289A. Pursuant to Rule 6(e)(4) of the Superior Court Rules of Criminal Procedure, the indictment was sealed and a warrant was issued for defendant. The next day, the indictment was unsealed, as defendant was already incarcerated at the [Adult Correctional Institutions]; there was no need to arrest him. The defendant was promptly arraigned in the Superior Court on May 25, 2018; he entered a plea of not guilty and

- 37 -

# C

## Application of Collateral Estoppel to Probation-Revocation Proceedings

Tavares asserts that the trial justice erred when he denied defendant's motion to dismiss the indictment pursuant to the collateral estoppel doctrine, as set forth in *State v. Wiggs*, 635 A.2d 272 (R.I. 1993).

In *Wiggs*, a trial justice determined that the defendant had committed a trespass and a simple assault, and thus violated the terms of probation. *Wiggs*, 635 A.2d at 274. In so doing, the trial justice also concluded that there was "insufficient evidence to find that defendant had committed breaking and entering." *Id.* at 275. With respect to the breaking-and-entering charge, Wiggs argued that the state was barred from proceeding under this theory at trial since it had unsuccessfully litigated this charge at the probation-revocation hearing. *Id.* at 274.

On appeal, this Court agreed and observed that "[c]ollateral estoppel acts as a bar if there is an identity of issues, the prior proceeding resulted in a final determination on the merits, and the party against whom collateral estoppel is sought is the same as, or in privity with, the party in the prior proceeding." *Wiggs*, 635 A.2d at 275. We explained that there was no question that the parties involved in the probation-revocation proceeding and the trial proceeding were the same parties and

---

was remanded to the [Adult Correctional Institutions]."
*Id.* at 897.

that the record reflected a final judgment on the merits in the probation-revocation proceeding. *Id.*

With respect to the final collateral estoppel consideration—whether both proceedings presented identical issues—this Court noted that three factors must be examined: "First, the issue sought to be precluded must be identical to the issue decided in the prior proceeding; second, the issue must actually have been litigated; and third, the issue must necessarily have been decided." *Wiggs*, 635 A.2d at 275 (brackets omitted) (quoting *State v. Chase*, 588 A.2d 120, 123 (R.I. 1991)). The state conceded that the revocation and trial proceeding issues were "identical," but claimed the breaking-and-entering issue had not been "actually litigated" at the probation-revocation stage. *Id.* at 276. This Court rejected the state's argument and observed that in *Chase*, we had "held that the decision of the trial justice at a probation-revocation hearing is a final and valid judgment." *Id.*

In *State v. Gautier*, 871 A.2d 347 (R.I. 2005), however, our holding in *Chase* was laid to rest. We explained that "further application of the doctrine of collateral estoppel to bar relitigation of a criminal charge, following a determination during a probation-revocation hearing that is adverse to the state, inequitably overlooks and misconceives the inherent and important differences between those proceedings and criminal trials." *Gautier*, 871 A.2d at 358. This Court concluded that further application of *Chase* would "strongly counteract the significant public interest in the

preservation of the criminal trial process 'as the intended forum for ultimate determinations as to guilt or innocence of newly alleged crimes.'" *Id.* at 359 (quoting *Lucido v. Superior Court*, 795 P.2d 1223, 1230-31 (Cal. 1990)).

While *Gautier* overruled *Chase*, Tavares argues that *Gautier* did not abrogate *Wiggs*, upon which he relies. Because the state litigated the first-degree sexual assault issue during the probation-revocation hearing, Tavares insists that pursuant to *Wiggs*, the state was collaterally estopped from re-litigating this issue during the criminal trial. We disagree and conclude that *Gautier* controls our analysis.

It is true that *Gautier* did not expressly overrule *Wiggs*, but it is equally pellucid that *Gautier* rejected the collateral estoppel analysis set forth in *Chase* and *Wiggs*. In *Chase*, this Court held that "a specific finding on a material matter of fact fully litigated at the probation-revocation hearing will collaterally estop the state from attempting to prove the same fact at trial." *Chase*, 588 A.2d at 123. Later, in *Wiggs*, this Court relied upon *Chase* and concluded that "the decision of the trial justice at a probation-revocation hearing is a final and valid judgment." *Wiggs*, 635 A.2d at 276. Both conclusions are inextricably at odds with our pronouncement in *Gautier* that "practical public policy requires that new criminal matters, when charged in the criminal justice system, must be permitted to be there decided, unhampered by any parallel probation-revocation proceedings." *Gautier*, 871 A.2d

at 359 (brackets omitted) (quoting *State v. Dupard*, 609 P.2d 961, 965 (Wash. 1980)).[21]

In this case, the trial justice appropriately rejected the repudiated *Chase-Wiggs* collateral estoppel analysis and adhered to *Gautier* where we joined the majority of courts that have addressed this issue. *See Gautier*, 871 A.2d at 359. In so doing, the trial justice properly denied Tavares's motion to dismiss the indictment on the ground that the state had previously litigated the sexual assault issue during the probation-revocation proceedings.[22] *See Tavares*, 251 A.3d at 896-98. On a *de novo* review, we reject defendant's claim of error.

---

[21] This Court has not cited *State v. Wiggs'* collateral estoppel analysis since *Gautier*. *See State v. Gautier*, 871 A.2d 347, 356 (R.I. 2005) ("In the years since *Wiggs*, we have issued several decisions that conflict with the principles first espoused in *Chase* and that render its application uncertain and problematic."). More recently, in *State v. Minior*, 175 A.3d 1202, 1206 (R.I. 2018), we cited *Wiggs* in support of a non-collateral-estoppel proposition and observed that *Wiggs* was "abrogated on other grounds by *State v. Gautier*, 871 A.2d 347 (R.I. 2005)." In an abundance of clarity, we reiterate that *Wiggs'* collateral estoppel analysis has been abrogated as explained in *Gautier*. *See Gautier*, 871 A.2d at 357-60.

[22] We further observe that in both *Wiggs* and *State v. Chase*, the Superior Court concluded that the defendants did *not* violate the terms and conditions of probation with respect to one or more charged offenses. *See Wiggs*, 635 A.2d at 275; *Chase*, 588 A.2d at 121. Based upon these probation-revocation determinations, this Court concluded that the state was collaterally estopped from prosecuting the defendants for conduct that did not result in a probation violation. *See Wiggs*, 635 A.2d at 276; *Chase*, 588 A.2d at 123. In contrast, Tavares was found to have violated the terms and conditions of probation, *see Tavares*, 251 A.3d at 896, but nonetheless sought to estop the state from proving the charges at trial. For the reasons discussed above, we need not examine this distinction because our analysis is controlled by *Gautier*.

# D

## The Rule of Consistency

Tavares and Johnson were both charged with conspiracy to commit first-degree sexual assault. When Johnson pled to a charge of felony assault, the state dismissed the conspiracy charge against Johnson pursuant to Rule 48(a) of the Superior Court Rules of Criminal Procedure.[23] Tavares contends that because a conspiracy requires the actions of two or more persons—and because the conspiracy charge against Johnson was dismissed—he cannot be convicted of conspiracy and the trial justice erred by not dismissing the indictment.

"The crime of conspiracy is an agreement between 'two or more persons to commit an unlawful act or to perform a lawful act for an unlawful purpose.'" *State v. Ros*, 973 A.2d 1148, 1163 (R.I. 2009) (quoting *State v. Graham*, 941 A.2d 848, 863 (R.I. 2008)). "In Rhode Island, the rule of consistency provides that 'one defendant in a prosecution for conspiracy cannot be convicted when all of his alleged coconspirators, be they one or more, have been acquitted or been discharged under circumstances which amount to an acquittal.'" *Id.* at 1173 (quoting *State v. Reis*, 815 A.2d 57, 64 (R.I. 2003)). We have observed that the reason for this rule is that

---

[23] Rule 48(a) of the Superior Court Rules of Criminal Procedure provides that "[t]he attorney for the State may file a dismissal of an indictment, information, or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without consent of the defendant."

because "the acquittal of all but one potential conspirator negates the possibility of an agreement between the sole remaining defendant and one of those acquitted of the conspiracy and thereby denies, by definition, the existence of any conspiracy at all." *Id.* (quoting *Reis*, 815 A.2d at 64 n.5).

Tavares does not suggest that the Rule 48(a) dismissal is an acquittal; rather, defendant maintains that the conspiracy count against Johnson was "discharged under circumstances which amount to an acquittal." Since the state dismissed the conspiracy charge against Johnson, Tavares submits that pursuant to the rule of consistency, the trial justice erred by not dismissing the conspiracy charge against him. We disagree.

In *Reis*, a coconspirator pled nolo contendere to "conspiracy to possess *less* than five kilograms of marijuana and conspiracy to possess the same with intent to deliver." *Reis*, 815 A.2d at 61 (emphasis added). On the basis of this plea agreement, Reis moved for judgment of acquittal on the charge of conspiracy to possess *more* than five kilograms of marijuana, arguing that the coconspirator's plea agreement and the state's dismissal of the "conspiracy to possess *more* than five kilograms" charge precluded his conviction. *Id.* at 63 (emphasis added). This Court rejected the rule-of-consistency argument and explicated that the "circumstances in which the charges against [the coconspirator] were disposed of do not amount to an acquittal, therefore making the rule of consistency inapplicable." *Id.* at 64.

Importantly—and contrary to the argument advanced by Tavares—we added in *Reis* that "the government's voluntary dismissal of a conspiracy charge against a defendant's only alleged coconspirator does not preclude proof beyond a reasonable doubt, at defendant's trial, that the defendant conspired with that same alleged coconspirator." *Id.* at 65 (quoting *United States v. Lopez*, 944 F.2d 33, 40 (1st Cir. 1991)).

Here, the conspiracy charge against Johnson was dismissed pursuant to Rule 48(a). Because a Rule 48(a) dismissal is neither an acquittal nor circumstances that amount to an acquittal, the rule of consistency did not preclude Tavares's conviction on the charge of conspiracy to commit first-degree sexual assault.[24] *See Reis*, 815 A.2d at 64-65. Accordingly, we conclude the trial justice did not err when he denied the motion to dismiss and determined that the rule of consistency did not bar Tavares's conviction on the conspiracy charge.

---

[24] In *State v. Reis*, 815 A.2d 57 (R.I. 2003), this Court expressed "doubt [concerning] the wisdom of the rule" and observed that the rationale supporting the rule of consistency "has been substantially undermined by the United States Supreme Court." *Reis*, 815 A.2d at 64 n.5. We further expressed that "[i]f a case comes before this Court in which the rule of consistency is directly at issue in a conspiracy case, we would consider reviewing the validity of that rule." *Id.* at 65 n.5. This is not such a case.

# E

## Voir Dire of Jurors 142 and 223

In this case, voir dire commenced with the trial justice distributing a list of questions for the prospective jurors. The trial justice advised the venire members to consider how they might respond to a question and that if a prospective juror wished to answer in private, he or she should alert the trial justice and an opportunity would be provided for the prospective juror to answer outside the presence of other venire members.

Before any panel members were selected, eight venire members—Jurors 213, 142, 218, 129, 232, 223, 157, and 111 ("the eight venire members")—requested to answer one or more voir dire questions outside the presence of other venire members. After conducting individual voir dire of the eight venire members outside the presence of other venire members, the trial justice excused Jurors 213, 129, 232, 157, and 111, for cause. The dismissal of these venire members is not challenged on appeal. Juror 218 was not excused during this initial voir dire process, nor was Juror 218 selected from the venire.

Tavares focuses on the two remaining members—Jurors 142 and 223—both of whom were selected from the venire after the initial voir dire process and were subsequently subjected to additional voir dire in the presence of the venire and panel members. During the voir dire in the presence of other venire and panel members,

Juror 142 was questioned concerning whether any close friends or family members had ever been a victim of a crime. Juror 142 responded that a family member had been a victim of an unwanted and unreported sexual contact. Tavares later exercised a peremptory challenge and Juror 142 was excused.

When Juror 223 was selected for the panel, the trial justice posed similar questions in the presence of the venire and panel members, including whether any close friends or relatives had "ever been involved in a criminal case, either as a complaining witness, an eyewitness, or a defendant" and whether "any family member, or close personal friend [had] ever been accused of sexual assault?" Juror 223 responded to the former query that there were "two family members that aren't spoken to anymore that were defendants" and was asked only general questions concerning this subject matter. Juror 223 was seated as a juror.

In *State v. Gomes*, 690 A.2d 310 (R.I. 1997), this Court examined the defendant's argument that prospective jurors should have been individually questioned outside the presence of other panel members regarding their personal experiences with sexual abuse or molestation. *See Gomes*, 690 A.2d at 314. The trial justice declined to proceed in this manner, which the defendant argued prejudiced his ability to receive a fair trial and infected the ability of panel members to respond truthfully to the voir dire. *Id.* at 314-15.

We rejected Gomes's claim and recognized that potential jurors will presumptively "fully and truthfully answer the questions put to them by the trial justice." *Gomes*, 690 A.2d at 315. This Court further recognized that "the trial justice's tactful form of questioning did not impede the potential panel members' ability to answer truthfully," and that the form of the trial justice's questions "ensured that potential jurors need not associate themselves with an upsetting or embarrassing experience in order to be excused from the panel." *Id.* at 315-16.

Our review of the voir dire in this case demonstrates that the trial justice likewise delicately balanced ensuring a fair and impartial jury with preserving panel members' privacy and dignity. During the voir dire conducted in the presence of other venire and panel members, the trial justice combined and generalized questions in a manner that "ensured that potential jurors need not associate themselves with an upsetting or embarrassing experience * * *." *Gomes*, 690 A.2d at 316. For example, the trial justice asked Juror 142 whether "any close friends or member of your family [had] ever been the victim of a crime?" The trial justice employed a similar technique with respect to Juror 223, inquiring whether any close friends or relatives had "ever been involved in a criminal case, either as a complaining witness, an eyewitness, or a defendant?" Later, the trial justice queried whether "any family member, or close personal friend [had] ever been accused of sexual assault?"

- 47 -

Tavares's counter arguments are without merit. Specifically, Tavares claims that having witnessed Jurors 142 and 223 respond to sensitive questions in the presence of other venire and panel members despite their request to the contrary, "the remaining six juror[s] would have had to endure the same" and "[t]here is no[] way to determine the psychological effects answering those questions [would have] * * * on those jurors, but the outcome was to Mr. Tavares['s] prejudice." This is nothing more than rank speculation contradicted by the trial record and our precedent. *See Gomes*, 690 A.2d at 315 n.2 (rejecting defendant's argument that answers given by one prospective juror might infect other prospective jurors absent "highly unusual circumstances such as questioning jurors about exposure to press reports").

As evidenced by the record, by the time Jurors 142 and 223 were subject to voir dire in the presence of other venire and panel members, Jurors 213, 129, 232, 157, and 111 were already excused. While Juror 218 may have witnessed the voir dire of Jurors 142 and 223, Juror 218 was never selected for the panel and was never subject to voir dire in the presence of other venire or panel members. In other words, none of the other six prospective jurors who form the basis of Tavares's undue-prejudice appellate argument were ever subject to voir dire in the presence of other venire or panel members.

Notwithstanding Tavares's speculative and unsupported argument, this Court has previously recognized that "[t]he scope of examination of prospective jurors and their disqualification is a matter that lies within the sound discretion of the trial justice." *State v. Taylor*, 423 A.2d 1174, 1175 (R.I. 1980). Considering this deferential standard of review, as well as the record demonstrating that the more sensitive topics were explored with specificity outside the presence of other venire and panel members while the same or similar sensitive topics were examined more generally within the presence of other venire and panel members, we discern no abuse of discretion in the manner in which the trial justice conducted voir dire. Thus, we reject the defendant's final argument.

## IV

## Conclusion

For the reasons stated herein, the judgment of conviction is affirmed. The record shall be remanded to the Superior Court.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Victor Tavares. |
| **Case Number** | No. 2022-152-C.A. (P1/18-1289A) |
| **Date Opinion Filed** | April 22, 2024 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, Lynch Prata, and Long, JJ. |
| **Written By** | Associate Justice Maureen McKenna Goldberg |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Joseph A. Montalbano |
| **Attorney(s) on Appeal** | For State: <br><br> Christopher R. Bush <br> Department of Attorney General |
| | For Defendant: <br><br> Victor Tavares, *pro se* |